FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

Fort Myers Division

2017 APR 13  AM 10: 02

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>-and-<br><br>THE STATE OF FLORIDA, *ex rel.*<br>[UNDER SEAL]<br><br>  *Plaintiffs*,<br><br>v.<br><br>[UNDER SEAL]<br><br>  *Defendants*. | **Case No.** _____<br><br>**Complaint for Violations of the Federal False Claims Act, 31 U.S.C. § 3729, *et seq*.; Florida False Claims Act, Fla. Stat. § 68.081, *et seq*.; Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, *et seq*.; Florida Whistleblower Protection Statute, Fla. Stat. §§ 448.101-448.103, *et seq.***<br><br>**FILED UNDER SEAL**<br><br>**Jury Trial Demanded** |

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT



FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA** 2017 APR 13  AM 10: 54

Fort Myers Division

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS FLORIDA

---

UNITED STATES OF AMERICA

-and-

THE STATE OF FLORIDA

EX REL. FRANKA TIRADO
    1405 Woodwell Road
    Silver Spring, Maryland 20906

EX REL. BRIAN SNYDER
    193 Abbey Lane
    North Fort Myers, Florida 33917

    *Plaintiffs*,

v.

PARK ROYAL HOSPITAL
    9241 Park Royal Drive
    Fort Myers, Florida 33908

ACADIA HEALTHCARE
    6100 Tower Circle, Suite 1000
    Franklin, Tennessee 37067

LEE HEALTH
    1555 Matthew Drive
    Fort Myers, Florida 33901

MIKE HAM
    9241 Park Royal Drive
    Fort Myers, Florida 33908

JOHN HULL
    6100 Tower Circle, Suite 1000
    Franklin, Tennessee 37067

    *Defendants*.

---

Case No. 2:17-CV-201-FtM-99Mem

**Complaint for Violations of the Federal False Claims Act, 31 U.S.C. § 3729, *et seq*.; Florida False Claims Act, Fla. Stat. § 68.081, *et seq*.; Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, *et seq*.; Florida Whistleblower Protection Statute, Fla. Stat. §§ 448.101-448.103, *et seq.*

**FILED UNDER SEAL**

**Jury Trial Demanded**

## INTRODUCTION

1.      *Qui tam* Relators Franka Tirado ("Tirado") and Brian Snyder ("Snyder"), by their attorneys, individually and on behalf of the United States of America and the State of Florida, file this Complaint against Defendants Park Royal Hospital ("PRH"), Acadia Healthcare ("Acadia"), Lee Health ("Corporate Defendants"), Mike Ham ("Ham"), and John Hull ("Hull") ("Individually Named Defendants") (all collectively, "Defendants") to recover damages, penalties, and attorneys' fees for violations of the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.* and the Florida False Claims Act, Fla. Stat. § 68.081, *et seq.*

2.      **The Defendants operate PRH like a prison. Patients are:**

   a. **admitted even though they are ineligible for treatment,**

   b. **forced to stay for weeks beyond their discharge date,**

   c. **administered sub-standard drug treatment that PRH is ineligible to provide,**

   d. **converted from voluntary to involuntary admission status,**

   e. **drugged into submission, and**

   f. **subjected to electroconvulsive shock therapy without their consent.**

3.      Discussed more fully below, Defendants' conduct results in severe patient harm and the submission of false claims for payment to the United States and the State of Florida.

4.      PRH is a Medicare-certified psychiatric hospital with two facilities. One PRH facility in Fort Myers, Florida, provides outpatient medical services and currently has about 115 patient beds for acute inpatient care. A second PRH facility in Naples, Florida, provides only outpatient psychiatric services.

5.      PRH opened in March 2012 and is the only inpatient psychiatric hospital in Lee County, Florida.

6.      Approximately 80 percent of PRH patients are Medicare and/or Medicaid insured.

7.      Acadia operates a network of behavioral health facilities across the country and acquired PRH in November 2012.

8.      Ham, an Acadia employee, began serving as the Chief Executive Officer of PRH in August 2015.

9.      Hull, Acadia's Divisional Chief Executive Officer, oversees 60 to 70 Acadia facilities, including PRH.

10.     Established in 1916, Lee Health is the largest healthcare system in Southwest Florida. Lee Health operates out of more than 100 locations, including four acute care hospitals and two specialty hospitals. Lee Heath's flagship facility, Lee Memorial Hospital, is a 355-bed acute care facility located in Fort Myers, Florida.

11.     The Defendants are violating or have violated the False Claims Act[1] in at least two ways:

        a.  PRH bills Medicare and Medicaid for services not rendered, for medically
            unnecessary services, and for services it is ineligible to provide; and

        b.  Pursuant to an unlawful kickback arrangement, PRH sends patients to hospitals
            within the Lee Health system for non-psychiatric medical services that are billed
            to Medicare and Medicaid, including services never rendered to these patients in
            violation of 42 U.S.C. § 1320a-7b, *et seq*.

---

[1]     Because both the elements of the Federal and the Florida False Claims Acts are largely
the same, references to the "False Claims Act" or "FCA" include both the state and federal
causes of action, unless otherwise indicated.

12.     The Defendants' unlawful business practices have endangered many patients – some have even resulted in patient deaths – and cost the U.S. Government and taxpayers millions of dollars.

13.     When Snyder disclosed his concerns about PRH's unlawful business practices, PRH terminated his employment.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

15.     Snyder's federal cause of action for unlawful retaliation is authorized by 31 U.S.C. § 3730(h).

16.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because the Corporate Defendants conduct business within this judicial district and the Individually Named Defendants are domiciled in or conduct business within this judicial district.

17.     Venue is proper in this Court under 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732(a) because the illegal acts giving rise to this action occurred within this judicial district, because the Corporate Defendants conduct business within this judicial district, and because the Individually Named Defendants are domiciled or conduct business within this judicial district.

## THE PARTIES

**Relator Franka Tirado**

18.     Tirado is a citizen of the United States and a resident of Maryland.

19.     Tirado is the "original source" of this information within the meaning of 31 U.S.C. § 3730(e)(4)(B) and states that her knowledge of the information contained herein has not been publically disclosed.

20.     Tirado is longtime healthcare executive with a Master's degree in Health Care Administration from the University of Maryland.

21.     Tirado also completed a Graduate Certificate in Corporate Compliance from George Washington University.

22.     Tirado moved to Florida and worked for PRH starting in 2016 as Director of Risk Management and Quality Improvement.

23.     Tirado was responsible for overseeing PRH's accreditation and licensure.

24.     Tirado also handled patient grievances, physician credentialing, and day-to-day risk management and quality issues.

25.     Tirado resigned from PRH in September 2016 because of PRH's unlawful business practices.

**Relator Brian Snyder**

26.     Snyder is a citizen of the United States and a resident of Florida.

27.     Snyder is the "original source" of this information within the meaning of 31 U.S.C. § 3730(e)(4)(B) and states that his knowledge of the information contained herein has not been publically disclosed.

28.     Snyder graduated from the University of Maryland with a Bachelor of Arts in Psychology.

29.     Snyder later earned a Master of Science degree in Mental Health Counseling from Shippensburg University.

30.     Snyder joined PRH in October 2015 as PRH's Utilization Review Specialist.

31.     Snyder received a promotion to Admissions Director in April 2016.

32.     As Admissions Director, Snyder managed the admissions department and emergency room for the hospital; tracked patient, business, and insurance data; and participated in leadership activities.

33.     PRH terminated Snyder in February 2017 after Snyder repeatedly disclosed concerns about PRH's unlawful business practices.

**Defendant Park Royal Hospital**

34.     PRH is a Medicare-certified psychiatric hospital with two facilities. One PRH facility in Fort Myers, Florida, provides outpatient medical services and currently has about 115 patient beds for acute inpatient care. A second PRH facility in Naples, Florida, provides only outpatient medical services.

35.     According to U.S. Securities and Exchange Commission ("SEC") filings, Park Royal Hospital is the business name for the corporate entity known as The Pavilion at Healthpark.

36.     PRH secured Florida state approval in September 2012 to accept patients under Florida's Baker Act, where patients can be involuntarily detained for a psychiatric evaluation because of concern by law enforcement or family members that the individuals pose a safety risk to themselves or others.

37.     PRH employs psychiatrists, social workers, therapists, primary care physicians (contracted), mental health technicians, and nurses who provide inpatient and outpatient services for the treatment of many psychiatric conditions such as depression, anxiety, mood disorders,

memory problems, post-traumatic stress disorder, other mental illnesses, and co-occurring substance abuse disorders.

38.     PRH accepts Medicare, Medicaid, and private insurance.

39.     Approximately 80 percent of PRH patients are Medicare and Medicaid insured.

40.     Even though PRH is only allowed to admit patients requiring emergency medical care for mental illness, PRH routinely admits insured patients for inpatient treatment at PRH who do not require emergency medical care for mental illness and extends the stay for insured patients to the maximum number of days they are covered under their insurance plans regardless of medical necessity.

41.     To the extent PRH actually accepts uninsured individuals, PRH discharges uninsured patients earlier than insured patients.

42.     PRH reported in its 2014 annual report total net revenue of $23,574,538, $21,839,414 for inpatient care and $1,735,124 for outpatient care, a jump from PRH's reported total net revenue of $17.5 million in 2013.

**Defendant Acadia Healthcare**

43.     Headquartered in Franklin, Tennessee, Acadia was established in January 2005 to develop and operate a network of behavioral health facilities across the country. Altogether, Acadia operates a network of 573 behavioral healthcare facilities with approximately 17,100 patient beds in 39 states, the United Kingdom, and Puerto Rico.

44.     Acadia bought PRH in November 2012 for $33.4 million in cash and assumed PRH's debts.

45.     In a July 29, 2016, SEC quarterly filing, Acadia reported total revenue of $756 million for the quarter, which was up 66.8 percent on a year-to-year basis.

**Defendant Lee Health**

46.     Founded in 1916, Lee Health consists of four acute care hospitals (Lee Memorial Hospital, HealthPark Medical Center, Gulf Coast Medical Center, and Cape Coral Hospital) and two specialty hospitals (Golisano Children's Hospital of Southwest Florida and The Rehabilitation Hospital).

47.     Lee Health is the largest public health system in the State of Florida with a total of 1,426 patient beds and more than one million patient contacts every year..

48.     Before PRH opened, PRH was under contract with Lee Health to run the 15-bed Senior Behavioral Care program at Lee Memorial Hospital. The patients and staff moved to the new hospital in August 2012.

49.     At the time of the announcement, Lee Health President and Chief Executive Officer Jim Nathan said he expected Lee Health to be actively involved with Acadia.

**Defendant Mike Ham**

50.     Ham is an Acadia employee and has been the Chief Executive Officer of PRH since August 2015.

51.     Before his assignment to PRH, Ham served as the Chief Executive Officer of the following facilities:

      a.   Heartland Behavioral Health Services in Nevada, Missouri;

      b.   Saint Simons By-The-Sea in St. Simons, Georgia;

      c.   Acadia-owned Greenleaf Hospital in Valdosta, Georgia;

      d.   Acadia-owned North Tampa Behavioral Health in Wesley Chapel, Florida; and

      e.   Acadia-owned Village Behavioral Health in Louisville, Tennessee.

Ham does not have a college degree, medical training, or a license to practice medicine, yet Ham, along with Hull, directs PRH's patient admission, discharge, and care decision processes.

**Defendant John Hull**

52.     Hull is Divisional Chief Operating Officer for Acadia and overseas 60 to 70 Acadia facilities, including PRH.

53.     Before becoming Division Chief Executive Officer for Acadia, Hull served as Chief Executive Officer for PRH and Group Chief Executive Officer for Acadia, a role in which Hull oversaw approximately a dozen Acadia facilities, including facilities that Ham worked at prior to his starting at PRH.

54.     Hull, along with Ham, participates in and directs PRH's patient admission and care decision processes.

## BACKGROUND

### I.  About Medicare, Medicaid, and Inpatient Psychiatric Facilities

55.     Medicare is a federal health insurance program for people age 65 or older, people under age 65 with certain disabilities, and people of all ages with end-stage renal disease (permanent kidney failure requiring dialysis or a kidney transplant).

56.     Medicare offers eligible beneficiaries Part A hospital insurance, Part B medical insurance, and prescription drug coverage.

57.     Medicare Part A helps cover inpatient care in hospitals, including inpatient psychiatric facilities (IPFs).

58.     IPFs are paid under the IPF Prospective Payment System.

59.     In order to be paid under the IPF Prospective Payment System, IPFs must:

a.  Provide certification at the time of admission, or as soon thereafter as is reasonable and practicable, that the patient needs, on a daily basis, active inpatient treatment furnished directly by or requiring the supervision of IPF personnel;

b.  Provide the first re-certification as of the 12th day of hospitalization;

c.  Provide subsequent re-certifications at intervals established by a utilization review committee, but no less than every 30 days that the patient continues to need, on a daily basis, active inpatient treatment furnished directly by or requiring the supervision of IPF personnel;

d.  Furnish services while the patient is receiving either active psychiatric treatment or admission and related services necessary for diagnostic treatment; and

e.  Furnish patients active psychiatric treatment that can be reasonably expected to improve his or her condition.

60.    Medicare patients who are treated for psychiatric conditions in specialty facilities are covered for 90 days of care per illness with a 60-day lifetime reserve and for 190 days of care in freestanding psychiatric hospitals.

61.    Under the IPF Prospective Payment System, IPFs receive additional payments for treating patients with electroconvulsive therapy.

62.    Medicaid is a state run program that covers medical expenses for people with low or limited incomes.

63.    All states offer a variety of Medicaid programs that help people with Medicare costs.

64.     For services that both Medicare and Medicaid cover, Medicare pays first and Medicaid second by covering the remaining patient costs, such as Medicare co-insurances and co-payments.

65.     A portion of every state's Medicaid program, including Florida's, is funded by the federal government.  In Florida, the federal government funds approximately 60 percent of the state's Medicaid program.

## II. How Medicare Claims Are Submitted and Paid

66.     Medicare claims may be electronically submitted to a Medicare Administrative Contractor from a healthcare provider using a computer with software that meets electronic filing requirements as established by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) claim standard and by meeting Centers for Medicare and Medicaid Services ("CMS") requirements.

67.     Providers that bill institutional claims are also permitted to submit claims electronically via direct data entry screens.

68.     Medicare can send payments directly to a provider's financial institution whether claims are filed electronically or on paper.

## FACTUAL ALLEGATIONS

69.     Defendants are endangering patients to game Medicare and Medicaid for profits in two ways:

    a.  Defendants bills Medicare and Medicaid for medically unnecessary services, services never rendered, and services for which Defendants are ineligible to provide; and

b. Defendants are engaged in an unlawful kickback arrangement in which PRH sends Medicare and Medicaid patients to hospitals within the Lee Health system for non-psychiatric medical services that are billed to Medicare and Medicaid – including medically unnecessary services and services never rendered to PRH's patients – and Lee Health compensates PRH for admitting and treating uninsured patients.

## I.   Defendants Bill Medicare and Medicaid for Medically Unnecessary Services and Services Never Rendered

70.   Defendants engage in four schemes to bill Medicare and Medicaid for medically unnecessary services, services never rendered, and services for which Defendants are ineligible to bill:

a. PRH inappropriately admits individuals who do not meet IPF criteria for inpatient treatment, including insured individuals who can never reasonably be expected to improve from treatment;

b. PRH admits individuals who do meet IPF criteria for inpatient treatment but inappropriately keeps them longer than is medically necessary;

c. PRH inappropriately and unlawfully treats involuntarily admitted patients with electroconvulsive therapy; and

d. Defendants inappropriately operate a revolving door between PRH and PRH's halfway homes.

71.   Unlike the insured patients who stay at PRH until they have maximized their insurance, most uninsured patients are not even admitted to PRH even if they require emergency medical care for mental illness.

72.     PRH's admission rate for Medicare and Medicaid individuals is substantially higher than uninsured individuals.

73.     Defendants Ham and Hull participate and exert significant levels of influence in PRH's patient admission, discharge, and care decisions.

74.     While Hull has some medical experience, Ham has no medical training or license to practice medicine.

75.     Both Ham and Hull pressure PRH staff to admit insured individuals who are not medically eligible for inpatient care and to keep insured patients until their insurance runs out regardless of medical need.

76.     Ham meets daily with most of PRH's directors.

77.     Tirado and Snyder participated in the daily staff meetings with Ham.

78.     Ivan Mazzorana, PRH's Chief Medical Officer, is almost never present at the daily staff meetings with Ham, even though PRH's organizational chart shows that he is second in command on the Leadership team.



79.     During the daily staff meetings, Ham reviews the patient census and, based on the availability of insurance coverage, tells staff who to discharge and who to keep.

80.     A June 2014 PRH patient census shows a list of patients, patient admission dates, patient discharge dates, length of stay ("LOS") and insurer, as well as the total number of patients, average patient LOS by insurer, and total balances owed by insurer.

81.     The June 2014 PRH patient census report indicates that:

    a.  PRH admitted more Medicare patients,

    b.  The average LOS for PRH patients with Medicare was longer than PHR patients with other insurers, and

    c.  The total Medicare claims for payment were higher than for other insurers.

82.     Self-pay refers to patients who have paid up front for their care regardless of insurance status and is therefore not synonymous patients who are uninsured. The below screenshot does not capture those patients who are truly "uninsured" and from whom PRH does not anticipate receiving payment.

[Data table — spreadsheet of patient records; columns: MRN, Patient Name, Admit Date, Discharge Date, Admit Date, Baker Act Date, Baker Act Time, ABCA 24 HR report, Baker Act Exp Date, Baker Act Exp Time, Petiti on filed, from ALFIS NF, petition went to court, vol to ba, LOS, Acct Balance, FC, Payer, Denis d $, Denie d Days, Date denial receiv ed — contents illegible in detail for faithful transcription]

| | summary | Admits | Patient d LOS | | Balance 6/30/2014 |
|---|---|---|---|---|---|
| | BC | 12 | 96 | 8.00 | 55,680.51 |
| | Comm | 24 | 183 | 7.63 | 134,156.00 |
| | Humana | 0 | 0 | | |
| | Medicare | 84 | 806 | 9.60 | 744,984.09 |
| | Medicaid | 0 | 0 | | |
| | Self Pay | 11 | 83 | 7.55 | 33,897.50 |
| | Tricare | 0 | 0 | | |
| 131 patients | Total | 131 | 1168 | 8.92 | 1,028,718.10 |
| | 35 to court | 5 slf | 102 convert to vol | | 57 petitions |

83.  Ham orders PRH staff to discharge uninsured patients that are admitted to PRH almost immediately and to keep insured patients admitted to PRH until their insurance runs out, regardless of medical need.

84.  However, PRH does admit and keep uninsured individuals who courts order involuntarily admitted under Florida's Baker Act and uninsured individuals who Lee Health compensates PRH to treat pursuant to a kickback scheme described below. These patients drive up the average LOS for uninsured patients.

85.     Ham makes decisions about which patients to keep for continued treatment and which patients to discharge based solely on insurance coverage.

86.     One way in which Ham games Medicare and Medicaid is to require that substance abuse patients who are cleared to be discharged on a Thursday or Friday be held over the weekend before release.

87.     An employee of Lee Memorial Health had Lee Memorial Health's Director of Case Management, Christine Massey, contact Relator Tirado for help in getting the employee's husband released after he was cleared to be discharged on a Thursday or Friday but ordered by Ham to be kept over the weekend.

88.     This allows PRH to bill for an additional three or four days of medically unnecessary treatment.

89.     Ham proposes false medical reasons to the physicians for keeping patients and intimidates physicians when they recommend patients for discharge.

90.     When a patient's insurance runs out, Ham insists members of PRH's Utilization Review Committee contact the patient's insurance provider to request approval to keep the patient additional days.

91.     Whereas Medicare and Medicaid have lifetime caps on the number of days covered for treatment, commercial insurers approve patients for a set number of days for treatment at IPFs.

92.     Ham sends physicians coded text messages about not discharging patients, such as "We have [X] discharges today, I really need your help," or something to that effect.

93.     Hull often joins Ham's daily staff meetings when he visits PRH.

94.     At an early February 2017 daily staff meeting, Hull insisted on discussing every patient and the necessity of discharging insured patients or keeping uninsured patients.

95.     At the same February 2017 staff meeting, Hull said "Guys, I'm going to have to go back to Tennessee and explain why my division is $800,000 short this month, and half that is Park Royal," or words to that effect. Hull then looked at Jorge Diaz, PRH's Staff Psychiatrist, and indicated he wanted Diaz to keep insured patients who were scheduled for discharge, saying, "Help me out here. I could lose my job over this man. Help me out," or words to that effect.

96.     At the same February 2017 staff meeting, Hull told Eric Rosmith, PRH's Director of Outpatient Services, "get [the discharges] under control" and blamed Rosmith for how many insured patients were being "let go," or words to that effect.

97.     Both Hull and Ham are concerned about "days on the table," which refers to the number of days insurers authorize PRH to keep patients if they are needed.

98.     Patient records for patients who are kept at PRH when not medically necessary show they have normal symptoms, that they are alert, and that they are of sound mind and judgment, yet many are not discharged until weeks later.

99.     PRH also uses code words in patient records to justify keeping patients when not medically necessary while evading detection by Medicare and Medicaid, including but not limited to the following:

        a.     "no new psychiatric complaints";

        b.     "once a bed becomes available";

        c.     "maximum therapeutic gain";

        d.     "awaiting a safe discharge";

        e.     "pending discharge plan";

      f.   "discharge pending while";

      g.   "maximized treatment"; and

      h.   "returned to baseline."

100.    When these code words appear in a patient's chart, that is a signal that the patient should be eligible for discharge but that PRH has kept the patient on census anyway.

101.    PRH also uses code words in patient records when discharging uninsured patients even if they require additional treatment for emergency medical care for mental illness, including but not limited to the following:

      a.   "Atlanta list";

      b.   "at least 3 counties for discharge"; and

      c.   "lack capacity."

**A.  Scheme 1: PRH inappropriately admits insured individuals who do not meet IPF criteria for inpatient treatment.**

102.    There are two subgroups of insured individuals PRH admits for inpatient treatment that do not meet IPF criteria for inpatient treatment.

103.    First, PRH admits insured individuals who do not require emergency medical care for mental illness and/or whose conditions cannot improve at the time of their admission, including individuals with developmental disabilities and geriatric patients who suffer from dementia or Alzheimer's disease.

104.    PRH admits these insured individuals even though only those who require emergency medical care for mental illness and whose conditions can improve are eligible for inpatient treatment at IPFs.

105.     Another Acadia-owned facility, Valley Behavioral Health System in Arkansas was fined approximately $180,000 after a CMS audit revealed a similar practice there.

106.     Second, PRH admits insured individuals for substance abuse treatment and rehabilitation services who do not require emergency medical care for mental illness, including insured individuals who do not meet the medical definition of substance abuse and/or would not benefit from treatment. PRH can only render substance abuse treatment to individuals who also require emergency medical care for mental illness.

107.     PRH also denies patients' requests for discharge even though they do not meet IPF criteria for admission and their continued treatment at PRH is medically unnecessary.

108.     When denying requests for discharge from voluntarily admitted patients, PRH changes their admission status from voluntary to involuntary and list them as Baker Act patients, which allows PRH to detain them for at least three additional days for assessment and treatment.

109.     In addition to billing Medicare and Medicaid for the medically unnecessary services PRH renders to these patients, PRH also bills Medicare and Medicaid for rehabilitation and other therapeutic services PRH never rendered to these patients.

**B. Scheme 2: PRH admits insured individuals who do meet IPF criteria for inpatient treatment and inappropriately keeps them longer than is medically necessary.**

110.     There are two subgroups of insured individuals PRH admits for inpatient care who meet IPF criteria but PRH keeps longer than medically necessary and bills Medicare and Medicaid for their care.

111.     First, PRH keeps patients who are *involuntarily* admitted and kept after their psychosis is under control and/or when they no longer present a threat to themselves and others.

112.    Second, PRH keeps patients who are *voluntarily* admitted after their psychosis is under control and/or when they no longer present a threat to themselves and others.

113.    IPFs are not supposed to keep patients – irrespective of whether they are involuntarily or voluntarily admitted – after their psychosis is under control and/or when they no longer present a threat to themselves and others.

114.    In order to maximize their billing to Medicare and Medicaid, PRH denies these patients' requests for discharge even when their psychosis is under control and/or when they no longer present a threat to themselves and others.

115.    When denying requests for discharge from voluntarily admitted patients, PRH changes their admission status from voluntary to involuntary.

116.    Ham also pressures physicians to extend the Against Medical Advice/Right To Release period from 24 to 72 hours in order to maximize billing.

117.    Other schemes for keeping patients include but are not limited to refusing to give patients Right To Release forms, denying transportation, not coordinating follow-up or discharge planning, and not contacting family until the morning of the patient's discharge in which patients stay additional days if the patient's family lives two hours away and cannot immediately pick up the patient.

118.    In addition to billing Medicare and Medicaid for the medically unnecessary services PRH renders to these patients, PRH also bills Medicare and Medicaid for rehabilitation and other therapeutic services PRH never rendered to these patients.

**C. Scheme 3: PRH inappropriately and unlawfully treats involuntarily admitted patients with electroconvulsive therapy.**

119.    PRH administers electroconvulsive therapy ("ECT") to patients without their consent and bills Medicare and Medicaid for the ECT treatment.

120.    Patients treated with ECT are connected to a heart and brain monitor, given an IV, administered medication to paralyze their muscles, given foam bite blocks to bite down on, and connected to flashlight-shaped paddles coated with a blue conductive gel that are placed on their head.

121.    Following a quick buzzing sound, patients' bodies tense for about five seconds.

122.    Patients typically wake a minute or so after the procedure and are sent off to a recovery area until the anesthesia fully wears off.

123.    Published studies suggest that ECT treatment leads to memory loss and may be far more dangerous for the elderly than medication alone.

124.    The State of Florida regulates ECT treatment usage.

125.    Under Florida law, only consenting patients can receive ECT.

126.    Nevertheless, PRH administers ECT to patients involuntarily admitted to PRH under Florida's Baker Act that allows patients to be involuntarily detained for a psychiatric evaluation.

127.    Patients admitted to IPFs for treatment under Florida's Baker Act are deemed legally incompetent to provide express and informed consent to voluntary admission and treatment.

128.    Nevertheless, PRH administers ECT to involuntarily admitted patients who are admitted under Florida's Baker Act and legally incompetent to provide express and informed consent for ECT treatment.

129.    PRH changes the admission status of patients from involuntary to voluntary to treat them with ECT without their consent and then changes their admission status back to voluntary after treating them with ECT.

130.    PRH bills Medicare and Medicaid for the inappropriate and unlawful ECT treatments administered to involuntarily admitted patients.

131.    A PRH record shows that from January 1, 2014, to June 30, 2014, more PRH patients with Medicare were involuntarily admitted to PRH under Florida's Baker Act law than patients with other insurers combined and that PRH patients with Medicare who were involuntarily admitted to PRH under Florida's Baker Act law stayed longer at PRH than patients with other insurers combined.

**Park Royal Hospital**
**Baker Act Impact**
**FYTD 6/30/14**

| | | Jan | Feb | March | April | May | June | YTD |
|---|---|---|---|---|---|---|---|---|
| **Admits** | | | | | | | | |
| | Blue Cross | 20 | 16 | 19 | 11 | 12 | 12 | 90 |
| | Comm. | 19 | 32 | 26 | 32 | 23 | 24 | 156 |
| | Humana | 3 | | | | | 0 | 3 |
| | Medicare | 82 | 71 | 73 | 76 | 85 | 84 | 471 |
| | Medicaid | 1 | | | | | 0 | 1 |
| | Self Pay | 11 | 10 | 6 | 9 | 5 | 11 | 52 |
| | Tricare | | 1 | 3 | | | 0 | 4 |
| | | | | | | | | 0 |
| **Total admits** | | 136 | 130 | 127 | 128 | 125 | 131 | 777 |
| **Patient Days** | | | | | | | | |
| | Blue Cross | 265 | 149 | 180 | 184 | 112 | 96 | 986 |
| | Comm. | 362 | 339 | 191 | 293 | 198 | 183 | 1566 |
| | Humana | 38 | | | | | 0 | 38 |
| | Medicare | 1206 | 907 | 897 | 1051 | 1116 | 806 | 5983 |
| | Medicaid | 23 | | | | | 0 | 23 |
| | Self Pay | 179 | 84 | 378 | 44 | 30 | 83 | 798 |
| | Tricare | | 17 | 12 | | | 0 | 29 |
| | | | | | | | | 0 |
| **Total Patient Days** | | 2073 | 1496 | 1658 | 1572 | 1456 | 1168 | 9423 |

132.    From January 1, 2014, to June 30, 2014, Medicare paid PRH more for the treatment of patients involuntarily admitted to PRH under Florida's Baker Act than other insurers

combined. Medicare paid PRH $2,449,430 compared with a total of $1,211,343 that all other insurers combined paid PRH for the treatment of patients involuntarily admitted to PRH under Florida's Baker Act.

133.    PRH also administers ECT to voluntarily admitted patients who did not meet criteria for inpatient treatment.

134.    PRH charts "patient needs ECT" as a reason to admit voluntarily admitted patients who do not meet criteria for inpatient treatment and administers three to five treatments before discharging them.

### D. Scheme 4: Defendants operate a revolving door between PRH and PRH's halfway homes.

135.    PRH uses its halfway homes as a revolving door to readmit patients for additional treatment even though they do not meet the criteria for readmission and bills Medicare and Medicaid for their care.

136.    PRH owns halfway homes called Park Royal Recovery Residences that are located in high-crime areas where it is likely that a patient will relapse.

137.    Because Medicare and Medicaid coverage regenerates after patients are discharged, PRH sends male substance abuse patients to live at PRH's halfway homes where they relapse and are readmitted to PRH for additional treatment, even though they have not relapsed long enough to require substance abuse treatment.

138.    A single day of drug use, for example, is insufficient to justify lengthy and expensive detoxification treatment, yet PRH readmits former patients for three weeks of treatment or longer after a single day of drug use.

139.    After they are again discharged, PRH sends the patients back to PRH's halfway homes.

140.    The process continues over and over again, creating a revolving door between PRH and its halfway homes.

141.    PRH also collects approximately $400 or $500 in rent from former patients living at PRH's halfway homes.

142.    Many residents living at PRH's halfway homes are Social Security Disability Insurance beneficiaries or receive other public assistance that they use to pay their rent.

143.    PRH consequently benefits from the U.S. Government and State of Florida twice from Medicare and Medicaid beneficiaries also receiving public assistance who are admitted for inpatient treatment at PRH and live at PRH's halfway homes.

**E.  Specific patient examples of defendants' unlawful business practices.**

144.    The below patients, identified by initials, are examples of patients that PRH inappropriately and unlawfully admitted, treated, and billed Medicare and Medicare for services that were medically unnecessary, were never rendered, or PRH was ineligible to provide them.

<u>Patient B.P.</u>

157.    After admitting Patient B.P. for inpatient treatment at PRH, PRH kept Patient B.P. even though Patient B.P.'s stay was not medically necessary, transferred Patient B.P. to one of PRH's halfway homes, and readmitted Patient B.P. after Patient B.P. relapsed even though Patient B.P. did not meet the criteria for readmission to PRH for inpatient treatment.

158.     PRH paperwork for Patient B.P. shows that PRH first admitted Patient B.P. for

inpatient treatment at PRH on October 23, 2016, and discharged Patient B.P. on November 9,

2016.

```
                       PARK ROYAL HOSPITAL
                   DIAGNOSES / PROCEDURES VALIDATION              PAGE:      1

                                                         Date:   11/10/16
                                                         Time:   15:16:02

PATIENT NAME:                                        AGE:  35  SEX:   MALE
PATIENT NO:     964394      CHART NO: 000067789      HISTORY NO: 000067789
ADMISSION DATE: 10/23/16    DISCHARGE DATE: 11/09/16
FC: M MEDICARE              SRV:AW1 ACUTE DUAL DIAG
PHYSICIAN: 00004            DISCHARGE STATUS: 01 DISCHARGED HOME/SELF
```

159.     PRH paperwork for Patient B.P. dated November 2, 2016, shows that Patient

B.P.'s stay at PRH was medically unnecessary.

160. Patient B.P. had a drug relapse and PRH readmitted Patient B.P. for inpatient treatment on November 21, 2016.

161. As stated above, PRH is not licensed to provide stand-alone drug detox services. Rather, the patient must require emergency care for mental illness in order to be admitted.

162. Patient B.P. did not require emergency medical care for mental illness. Therefore, Patient B.P. did not meet the criteria for readmission to PRH for inpatient treatment.

163. PRH paperwork for Patient B.P. shows that Patient B.P. was a Medicare patient.

| | | | | | | ADV DIR: | U |
|---|---|---|---|---|---|---|---|
| | **PARK ROYAL HOSPITAL** | | | | | ADMIT BY: | TJV |
| PATIENT ACCOUNT NUMBER | | | | | | MEDICAL RECORD NUMBER | |
| 0964354 | 9241 Park Royal Drive · Ft. Myers, FL 33908 · (239) 985-2700 | | | | | 000067789 | |
| PATIENT (Full Name, Address, County, Phone) | BIRTH DATE | AGE | SEX | RACE | MAR ST | RELIGION | PATIENT SSN |
| | 06/01/1981 | 35 | M | W | D | U | ***-**-9095 |
| | PATIENT LEGAL STATUS | FC | ROOM / BED | | HSV CODE | | HIPAA NOTICE DATE |
| | V | M | 3129 /B | | AD2 | | 09/30/16 |
| | FATHER NAME | | | | MOTHER NAME | | |
| | | | | | | | |
| | REFERRAL AGENCY | | | | BIRTH PLACE | | |
| | | | | | | | |
| GUARANTOR (Name, Address, Phone, SSN, Relationship) | GUARANTOR EMPLOYER (Name, Address, Phone) | | | | ADMISSION DATE & TIME | | |
| | | | | | 10/23/16 17:13 | | |
| | | | | | ED LEVEL | | |
| | | | | | U | | |
| | | | | | ADMITTING PHYSICIAN (Name and Number) | | |
| | PHONE #: | | | | ASLAM ZAHEER 9241 PARK ROYAL DRIVE FORT MYERS FL 33908 | | |
| | | | | | PHONE #: | | |
| CONTACT 1 (Name, Address, Phone, Relationship) | CONTACT 2 (Name, Address, Phone, Relationship) | | | | | | |
| | | | | | ATTENDING PHYSICIAN (Name and Number) | | |
| | PHONE #: REL: | | | | ASLAM ZAHEER 9241 PARK ROYAL DRIVE FORT MYERS FL 33908 | | |
| | | | | | PHONE #: | | |
| PRIMARY INSURANCE | | | | | | | |
| Name of Insurance | Address | | | | | Telephone Number | |
| MEDICARE | PO BOX 2711 JACKSONVILLE FL | | | | | | |

Patient D.O.

164. PRH admitted Patient D.O. for inpatient treatment, kept Patient D.O. after Patient D.O. was stable and safe for release, transferred Patient D.O. to one of PRH's halfway homes,

and readmitted Patient D.O. after Patient D.O. relapsed even though Patient D.O. did not meet the criteria for readmission to PRH for inpatient treatment.

145.    PRH paperwork for Patient D.O. shows that PRH first admitted Patient D.O. for inpatient treatment on October 16, 2016, and discharged Patient D.O. on November 9, 2016.

| PATIENT NAME | MRN: | DATE OF ADMISSION | DATE OF DISCHARGE |
|---|---|---|---|
|  | 68210 | 10/16/16 | 11/9/16 |

146.    Patient D.O.'s Progress Note dated October 21, 2016, lacks any information that would justify a continued stay at PRH. The Progress Note says that Patient D.O. was "pleasant," "cooperative," "alert and oriented x4," "not psychotic at this time," and "denies suicidal, homicidal ideas, plans or intents." The Progress Note also states that Patient D.O.'s tentative discharge date was October 25 or October 26, 2016.

PROGRESS NOTE

DATE: 10/21/2016

**SUBJECTIVE:** Patient is seen, chart reviewed. Staff consulted.

At this time, the patient is stating "I feel more hopeful."

He has improved on his medications. He has not presented with any adverse side effects.

**MENTAL STATUS EXAM:** He is pleasant, cooperative. Easily engaged. He is alert and oriented x4. His speech is clear, coherent, goal-directed. Mood remains depressed and anxious, but much less so than on admission. His affect is full range and appropriate to mood. Patient is not psychotic at this time. He is cognitively intact. He denies suicidal, homicidal ideas, plans or intents. His insight is good. His judgment is good. His impulse control is intact.

**DIAGNOSTIC IMPRESSION:**
1. Major depressive disorder, recurrent, severe, without psychosis (F33.2).
2. History of hepatitis C.
3. Hypertension.
4. Chronic right knee pain.

**PLAN:** Continue present management.

Tentative discharge date 10/25 to 10/26/2016.

_____
Juan Rodriguez, MD        (Date and Time)

D: 10/21/2016 15:34:27 EST
T: 10/21/2016 15:36:50 EST/MIS1388/11260366
JOB#: 2801815

147.    Patient D.O.'s Progress Note dated October 24, 2016, also lacks any information that would justify a continued stay at PRH. The Progress Note says that Patient D.O. "is alert," "pleasant, cooperative, easily engaged," and "not psychotic at this time." Instead, the basis for Patient D.O.'s stay appears to be discharge was "[p]ending at this time while a safe and appropriate setting is found for this patient for this patient's discharge." [sic] Merely looking for placement for an otherwise healthy individual is not an appropriate basis for continuing inpatient therapy services.

148.    As provided above, these are false "code words" that indicate PRH is merely running up the bill to Medicare for a patient that does not need treatment services.

PROGRESS NOTE

DATE: 10/24/2016

Patient seen, chart reviewed, staff consulted.

**SUBJECTIVE:** At this time, the patient is relatively stable, but he remains depressed and anxious. He has not presented with any adverse side effects of medications at this time. We have discussed electroconvulsive therapy (ECT), but he refuses.

**MENTAL STATUS:** The patient is alert, he is oriented x4. He is pleasant, cooperative, easily engaged. His mood is depressed and anxious. His affect is constricted, but appropriate to mood. He is not psychotic at this time. He is cognitively intact. His insight is good. His judgment is good. His impulse control is intact.

**IMPRESSION:**
1. Major depressive disorder, recurrent, severe, without psychosis, F33.2.
2. Polysubstance use.
3. History of hepatitis C.
4. Hypertension.
5. Chronic right knee pain.

**PLAN:** Continue present management.

**TENTATIVE DISCHARGE:** Pending at this time while a safe and appropriate setting is found for this patient for this patient's discharge.

Juan Rodriguez, MD          (Date and Time)  10/25/16  1230

D: 10/24/2016 15:29:08 EST
T: 10/24/2016 15:31:29 EST/MIS1532/11267782
JOB#: 2804772

149.    Patient D.O.'s Progress Note dated October 31, 2016, shows that Patient D.O.'s

previous tentative discharge date of October 25 or October 26, 2016, was changed to November

2 or November 3, 2016. This is despite the fact that there is no indication that Patient D.O.

required an additional week of medical treatment.

PROGRESS NOTE

DATE: 10/31/2016

Patient seen. Chart reviewed. Staff consulted.

"I feel pretty good today."

At this time, the patient continues depressed but less than when last seen by me on Friday. He has not presented with any signs or symptoms of acute withdrawal at this time. He has not presented with any adverse side effect of medications.

**MENTAL STATUS:** The patient is alert. He is oriented x4. He is pleasant, cooperative, easily engaged. His speech is clear, coherent, goal directed. He is not psychotic at this time. His mood is depressed and anxious. His affect is full range and appropriate to mood. He is cognitively intact. He denies suicidal or homicidal ideas, plans or intents. His insight is good. His judgment is good. His impulse control is intact.

**DIAGNOSTIC IMPRESSION:**
1.   Major depressive disorder, recurrent, severe, without psychosis, F33.2.
2.   Hepatitis C.
3.   Hypertension.
4.   Chronic right knee pain.

**PLAN:** We will continue present management at this time.

Tentative discharge 11/02 or 11/03/2016.

_____   11/1/16  1500

Juan Rodriguez, MD        (Date and Time)

D: 10/31/2016 14:21:32 EST
T: 10/31/2016 14:23:39 EST/MIS1525/11294261
JOB#: 2815372

150.   PRH ultimately discharged Patient D.O. on November 9, 2016.

151.   PRH placed Patient D.O. at one of its halfway homes.

152.   PRH readmitted Patient D.O. for inpatient treatment on November 17, 2016.

## Certification of Person's Competence
## To Provide Express and Informed Consent

I have personally examined_____, a person being served at _____
_____ facility on _____, 20____ at _____ am  pm.

Express and informed consent means consent voluntarily given in writing, by a competent person, after sufficient explanation and disclosure of the subject matter involved to enable the person to make a knowing and willful decision without any element of force, fraud, deceit, duress, or other form of constraint or coercion.

This person is 18 years of age or older, is not now known to be incapacitated with a guardian, is not now known to be incompetent to consent to treatment with a guardian advocate, and does not have a health care surrogate or proxy currently making medical treatment decisions. I have found this person to be one of the following:

VOLUNTARY (#1)

☑ Competent to provide express and informed consent, as defined above, for voluntary admission to this facility and is competent to provide express and informed consent for treatment. He/she has the consistent capacity to make well reasoned, willful, and knowing decisions concerning his or her medical or mental health treatment. The person fully and consistently understands the purpose of the admission for examination/placement and is fully capable of personally exercising all rights assured under section 394.459, F.S.

BAKER ACT INCOMPETENT (#2)

☐ Incompetent to provide express and informed consent to voluntary admission. and thus is incompetent to provide express and informed consent to treatment. The person must be transferred to involuntary status and a petition for a guardian advocate filed with the Circuit Court.

BAKER ACT COMPETENT (#3)

☐ Refusing to provide express and informed consent to voluntary admission but is competent to provide express and informed consent for treatment. The person must be discharged or transferred to involuntary status.

_____          _____
Signature of Physician                                          License Number

_____          _____
Typed or Printed Name of Physician     J. Rodriguez MD     Date  10/17/16     Time  1300  am pm

Form shall be completed within 24 hours of a person's arrival at the receiving facility and filed in the clinical record of each person:
1. Admitted on a voluntary basis
2. Permitted to provide express and informed consent to his/her own treatment.
3. Allowed to transfer from involuntary to voluntary status
4. Prior to permitting a person to consent to his or her own treatment after having been previously found incompetent to consent to treatment.

```
                                   HSV: AD2
DOB: 08/25/1978   AGE: 38   SEX: M
ADMIT: 10/16/16   RM/BED: 3126 /A
ATT: RODRIGUEZ JUAN        #: 22
MR #: 000068210    PAT #: 0964303
```

See s. 394.459(3), 394.4625(1)(f), Florida Statutes
CF-MH 3104, Feb 05 (obsoletes previous editions)  (Recommended Form)

153.    Patient D.O. did not require emergency medical care for mental illness. Therefore,

Patient D.O. did not meet the criteria for readmission to PRH for inpatient treatment.

154.    PRH paperwork for Patient D.O. shows that Patient D.O. was a Medicare patient.

---

PARK ROYAL HOSPITAL

Patient Name:
Patient ID Number:
Physician:

Department of Health & Human Services
Centers for Medicare & Medicaid Services
OMB Approval No. 0938-0692

### An Important Message From Medicare About Your Rights

**As A Hospital Inpatient, You Have The Right To:**

- Receive Medicare covered services. This includes medically necessary hospital services and services you
  may need after you are discharged, if ordered by your doctor. You have a right to know about these
  services, who will pay for them, and where you can get them.

- Be involved in any decisions about your hospital stay, and know who will pay for it.

- Report any concerns you have about the quality of care you receive to the Quality Improvement
  Organization (QIO) listed here: **FMQAI, 5201 W. Kennedy Boulevard, Suite 900, Tampa, FL 33609
  1 (866) 800-8754     TTY/TDD# 1 (866) 800-8753**

---

**Your Medicare Discharge Rights**

**Planning For Your Discharge:** During your hospital stay, the hospital staff will be working with you to
prepare for your safe discharge and arrange for services you may need after you leave the hospital. When you
no longer need inpatient hospital care, your doctor or the hospital staff will inform you of your planned
discharge date.

**If you think you are being discharged too soon:**
- You can talk to the hospital staff, your doctor and your managed care plan (if you belong to one) about
  your concerns.
- You also have the right to an appeal, that is, a review of your case by a Quality Improvement
  Organization (QIO). The QIO is an outside reviewer hired by Medicare to look at your case to decide
  whether you are ready to leave the hospital.
    - **If you want to appeal, you must contact the QIO no later than your planned discharge date
      and before you leave the hospital.**
    - If you do this, you will not have to pay for the services you receive during the appeal (except for
      charges like copays and deductibles).
- If you do not appeal, but decide to stay in the hospital past your planned discharge date, you may have to
  pay for any services you receive after that date.
- Step by step instructions for calling the QIO and filing an appeal are on page 2.

To speak with someone at the hospital about this notice, call **(239) 985-2700 x 728**

---

**Please sign and date here to show you received this notice and understand your rights.**

Sig ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮                    | Date/Time

X

Form CMS-R-193 (approved 07/10)

HSV: AD2
▮▮▮▮▮▮▮  DOB: 08/25/1978   AGE: 38   SEX: M
ADMIT: 10/16/16   RM/BED: 3126 /A
ATT: RODRIGUEZ JUAN   B: 22
MR #: 000068210   PAT #: 0964303

---

<u>Patient F.M.</u>

155.    PRH treated Patient F.M. with ECT even though Patient F.M. had been admitted involuntarily under Florida's Baker Act.

156.    Patients admitted to IPFs under Florida's Baker Act are legally incompetent to provide express and informed consent to ECT treatment, and Florida law requires patient consent for ECT treatment.

157.    PRH admitted Patient F.M. approximately a dozen times.

158.    PRH paperwork for Patient F.M. from April 15, 2016, shows that Patient F.M. was admitted involuntarily under Florida's Baker Act and legally incompetent to provide express and informed consent to ECT.

**Certification of Person's Competence
To Provide Express and Informed Consent**

I have personally examined _____ , a person being served at _____
_____ facility on _____ , 20____ at _____ am  pm.

Express and informed consent means consent voluntarily given in writing, by a competent person, after sufficient explanation and disclosure of the subject matter involved to enable the person to make a knowing and willful decision without any element of force, fraud, deceit, duress, or other form of constraint or coercion.

This person is 18 years of age or older, is not now known to be incapacitated with a guardian, is not now known to be incompetent to consent to treatment with a guardian advocate, and does not have a health care surrogate or proxy currently making medical treatment decisions. I have found this person to be one of the following:

VOLUNTARY (#1)

☐ Competent to provide express and informed consent, as defined above, for voluntary admission to this facility and is competent to provide express and informed consent for treatment. He/she has the consistent capacity to make well reasoned, willful, and knowing decisions concerning his or her medical or mental health treatment. The person fully and consistently understands the purpose of the admission for examination/placement and is fully capable of personally exercising all rights assured under section 394.459, F.S.

BAKER ACT INCOMPETENT (#2)

☑ Incompetent to provide express and informed consent to voluntary admission. and thus is incompetent to provide express and informed consent to treatment. The person must be transferred to involuntary status and a petition for a guardian advocate filed with the Circuit Court.

BAKER ACT COMPETENT (#3)

☑ Refusing to provide express and informed consent to voluntary admission but is competent to provide express and informed consent for treatment. The person must be discharged or transferred to involuntary status.

FL 62315

_____
Signature of Physician

_____
License Number

Ivan Mazzorana, Jr., MD

_____
Typed or Printed Name of Physician

4/15/16
_____
Date

_____
Time  am pm

Form shall be completed within 24 hours of a person's arrival at the receiving facility and filed in the clinical record of each person:
1. Admitted on a voluntary basis
2. Permitted to provide express and informed consent to his/her own treatment.
3. Allowed to transfer from involuntary to voluntary status
4. Prior to permitting a person to consent to his or her own treatment after having been previously found incompetent to consent to treatment.

See s. 394.459(3), 394.4625(1)(f), Florida Statutes
CF-MH 3104, Feb 05 (obsoletes previous editions) (Recommend

```
                                    HSV:  AD1
DOB: 10/14/1976   AGE:  39    SEX: F
ADMIT: 04/15/16   RM/BED: 2105 /A
ATT: MAZZORANA IVAN      #: 1
MR #: 000063708   PAT #: 0961582
```
**BAKER ACT**

159.   PRH's Demand Bill for Patient F.M. shows that Patient F.M. was a Medicare

patient and received ECT treatment.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and State of Florida ex rel. Franka Tirado, et al. v. Park Royal Hospital, et al.*
35

DEMAND BILL

PARK ROYAL HOSPITAL
9241 PARK ROYAL DRIVE
FT MYERS FL
33908-9204
239-985-2700

| PATIENT NAME | ACCOUNT NO. | ADMIT DATE | DIS. DATE | PAGE |
|---|---|---|---|---|
| [redacted] | 962640 | 6/29/16 | 7/06/16 | 1 |

| 13743 GUARANTOR NAME/ADDR. | F/C | INS. CO/PLANS | POLICY # |
|---|---|---|---|
| [redacted] | M | MEDICARE | 328861776A |

| AGE | DR. NAME |
|---|---|
| 39 | MAZZORANA IVAN |

| CHRG CODE | | DESCRIPTION | QTY | UNIT PRICE | AMOUNT | CPT CODE |
|---|---|---|---|---|---|---|
| 7/24/16 | 0000001 | ADJUSTMENT | | | 2475.00CR | |
| 8/17/16 | 0000001 | ADJUSTMENT | | | 2475.00 | |
| 8/17/16 | 0000001 | ADJUSTMENT | | | 1319.76CR | |
| 8/17/16 | 0000000 | PAYMENT | | | 905.70CR | |
| 8/17/16 | 0000001 | ADJUSTMENT | | | 18.48CR | |
| 6/29/16 | 9011000 | ECT | 1 | 825.00 | 825.00 | 90870 |
| 7/01/16 | 9011000 | ECT | 1 | 825.00 | 825.00 | 90870 |
| 7/06/16 | 9011000 | ECT | 1 | 825.00 | 825.00 | 90870 |

| ** SUMMARY OF CHARGES ** | |
|---|---|
| ** TOTAL CHARGES ** | 2475.00 |
| ** TOTAL PAYMENTS ** | 905.70CR |
| ** TOTAL ADJUSTMENTS ** | 1338.24CR |
| ** TOTAL AMOUNT DUE ** | 231.06 |

160. Because Patient F.M. was legally incompetent to provide express and informed consent to ECT treatment and Florida law requires patient consent for ECT treatment, PRH illegally treated Patient F.M. with ECT treatment.

<u>Patient J.W.</u>

161. Ham ordered Snyder to admit Patient J.W. to PRH for inpatient treatment even though Patient J.W. did not require emergency medical care for mental illness.

162.    Ham called and told Snyder that Patient J.W. was taking the bus down from Atlanta, that Patient J.W. probably would not meet the admission criteria, but that Snyder should admit Patient J.W. anyway, or words to that effect.

163.    Ham told Snyder that Patient J.W. got kicked out of the recovery home Patient J.W. was living in and was effectively homeless, or words to that effect.

164.    In response to Ham, Snyder said that that homelessness was not an appropriate basis for an admission, or words to that effect.

165.    Ham replied that Patient J.W. was kicked out for doing drugs, or words to that effect.

166.    Snyder performed an intake assessment on Patient J.W., who told Snyder that she had schizophrenia but that it was under control and had been for years, or words to that effect.

167.    Based on Snyder's intake assessment on Patient J.W., Patient J.W. did not require emergency medical care for mental illness.

168.    Since PRH can only provide substance abuse treatment to individuals requiring emergency medical care for mental illness and Patient J.W. did not require emergency medical care for mental illness, Patient J.W. did not meet the criteria for admission to PRH.

169.    Snyder also concluded Patient J.W. did not need substance abuse treatment since Patient J.W. was not intoxicated and was not a threat to herself or others.

170.    Over Snyder's objections, PRH admitted Patient J.W. for inpatient treatment on October 25, 2016.

171.    Within 24 hours of receiving notification from Patient J.W.'s probation officer that Patient J.W. was in violation of her probation for crossing state lines, PRH determined Patient J.W. was stable enough for discharge and released her on November 10, 2016.

172. The fact that PRH deemed Patient J.W. stable at exactly the same time that it received a call from Patient J.W.'s probation officer confirms that PRH makes discharge decisions on factors unrelated to medical necessity.

173. PRH paperwork for Patient J.W. shows that Patient J.W. was admitted on October 25, 2016, and discharged on November 10, 2016.

| PATIENT NAME | MRN: | DATE OF ADMISSION | DATE OF DISCHARGE |
|---|---|---|---|
| | 6827| | |
| | | 10 25 16 | 11 10 16 |
| | ꓓR N | DEFICIENCY      ASSIGNED TO: | DATE COMPLETED |

174. Patient J.W.'s paperwork shows that Patient J.W. was admitted for substance abuse treatment but did not require emergency medical care for mental illness.

| PCN: | MRN: | Facility: Park Royal Hospital - FMA | ROOM#: |
|---|---|---|---|
| Age: 39 | Gender: | DOB: 08/04/1977 | |

**Chief Complaint**
VOLUNTARY ADMISSION FOR ONGOING PSYCHIATRIC CARE, COCAINE WITHDRAWAL

**HISTORY OF PRESENT ILLNESS**
39 YEAR OLD FEMALE CAME TO FACILITY FOR DETOX OFF COCAINE. SHE COMPLAINS OF COUGH AND SPUTUM X 2WEEKS AND URINARY BURNING AND FOUL SMELL X1 WEEK.

**Allergies -** No known drug allergies.
**Out-Patient Medications -** Please see the medication reconciliation.
**Past Med/Surg History -** C-SECTION
**Family History -** NA
**Social -** CURRENT NICOTINE USE, DENIES ETOH
**Code Status -** FULL CODE

**REVIEW OF SYSTEMS**

| Normal | Abnormal | | Comments on abnormals | Normal | Abnormal | | Comments on abnormals |
|---|---|---|---|---|---|---|---|
| ✓ | | Constitutional | | ✓ | | Integumentary | |
| ✓ | | Eyes | | ✓ | | Musculoskeletal | |
| ✓ | | ENMT | | | ✓ | Neurological | HA |
| ✓ | | Cardiovascular | | | ✓ | Psychological | SCHIZOPHRENIA |
| | ✓ | Respiratory | COUGH, SPUTUM | ✓ | | Endocrine | |
| ✓ | | Gastrointestinal | | ✓ | | Hematologic | |
| | ✓ | Genitourinary | BURNING | | | | |

**PHYSICAL EXAM**

| | |
|---|---|
| **Constitutional** | Afebrile, vital signs stable |
| **Eyes** | Pupils - PERRLA Sclera - Clear |
| **Ear/Nose/ Mouth/ Throat** | EARS - Within Normal Limits Hearing intact Nasal - Nose and Sinus No Discharge No sinus tenderness Nasal Passages Patent Tongue - Within Normal Limits Pharynx - WNL w/o inflammation Moist Mucous Membrane |
| **Neck** | General - Symmetric, Trachea midline Supple Thyroid - No thyroidmegaly, no thyroid tenderness |
| **Cardiovascular** | Palpation - PMI WNL, non-displaced Auscultation Regular rate rhythm Normal S1S2 No S3S4 No murmurs/rubs Carotids - Brisk upstroke bilaterally, no bruits, no thrills Pedal Pulses - 2+ DP/PT Edema - No edema present |
| **Respiratory** | Effort - No intercostal retraction, no use of accessory muscles No Acute Distress Auscultation Rate - Clear to auscultation bilaterally |
| **GI** | Abdomen - Normal bowel sounds No masses palpated No tenderness to palpation Guaiac - |
| **GU** | Adnexa/Parametria - BURNING WITH URINATION |
| **Lymphatic** | No lymphadenopathy in neck No lymphadenopathy in axilla |
| **Musculoskeletal** | Digits/Nails WNL Gait Within Normal Limits Normal ROM Range Of Motion - No pain, crepitation, or contracture |
| **Skin** | Inspection - No rashes, ulcers Warm/Dry |
| **Neurology** | Cranial Nerves - II-XII intact Motor - Normal |
| **Psych** | Level of Consciousness - Alert |

**ASSESSMENT AND PLAN**
1. Cough
MUCINEX AUGMENTIN
2. Dysuria
UA PENDING STARTED ON AUGMENTIN
**General Comments**

This document was created, approved and electronically signed by James Long on 10/26/2016 10:14 AM.          1 of 2

175.    Patient J.W.'s Progress Note dated October 31, 2016, lacks any information that would justify a continued stay at PRH. The Progress Note says Patient J.W. "is alert, oriented to all 4 spheres," "denied current auditory or visual hallucinations," and "denies suicidal or homicidal ideations, plans or intent." Instead, the basis for Patient J.W.'s stay appears to be that PRH is "looking for placement" at another facility.  Merely "looking for placement" for an

otherwise healthy individual is not an appropriate basis for continuing inpatient therapy services,

and, as indicated above, is code for keeping a patient at PRH despite the lack of medical

necessity.

---

PROGRESS NOTE

DATE: 10/31/2016

is a 39-year-old, black female. She was admitted voluntarily for schizophrenia, cocaine use and major depression. She is doing quite well. She states that she is sleeping okay. She feels much better. She has a smiling affect. She feels her medication regimen is perfect.

MENTAL STATUS EXAM: Reveals a black female who is calm, cooperative, adequately groomed, makes good eye contact. Muscle tone is normal. She is alert, oriented to all 4 spheres. Speech is fluent, coherent, normal volume and tone. Mood is euthymic. Affect is spontaneous. Mood congruent, appropriate to thought content. Thought process is organized. She denies current auditory or visual hallucinations. No delusions are noted or elicited. Short and long-term memory both test intact. Concentration is improved. Insight is improved. Judgment is intact at this time. She denies suicidal or homicidal ideations, plans or intent.

DIAGNOSTIC IMPRESSION:
1. F20.9, paranoid schizophrenia.
2. F33.2, major depression, recurrent.
3. F14.20, cocaine use disorder.

PLAN: We are going to continue the current treatment plan. They are looking for placement. At this point, she agrees that she needs to go to supportive living.


Michael Shaw, ARNP      (Date and Time)


Juan Rodriguez, MD      (Date and Time)

D: 10/31/2016 13:52:59 EST
T: 10/31/2016 13:55:17 EST/MIS1525/11294096
JOB#: 2815281

---

176.    Patient J.W.'s paperwork shows PRH staff determined on November 2, 2016, that

Patient J.W.'s stay was medically unnecessary.

| | | | |
|---|---|---|---|
| Patient ID | | # 964426 | |
| Review Date | | 11/2/16 | |
| OPTIONAL: REVERIFICATION OF BENEFITS | | # DAYS REMAINING | DATE VERIFIED |
| Traditional Medicare coverage verified | | [redacted] | 11/2/16 |
| Of 190 lifetime psych days, # days remaining | | 119 − 8 = 111 | ↓ |
| Of 90 days per current benefit period, # days remaining (Begins the first day of admission to IP or SNF and ends after no IP or SNF treatment IP or SNF for 60 days in a row) | | 52 Full, 30 co | ↓ |
| Of 60 lifetime reserve days, # days remaining | | 60 | ↓ |
| REQUIRED DOCUMENTATION | | DATE VERIFIED | ACTION/EXPLANATION: |
| C-3 | Physician Recertification on or by day 12 | Due 11/5 | |
| DOCUMENTATION OF CONTINUED STAY MEDICAL NECESSITY IN NOTES OF ATTENDING | | → NO | |
| C-7 | Active treatment, attending groups, cooperation with therapy and medication adjustments and cooperating with medication | yes | Per 11/1 note – "MSE within norm. Continue present management until DC placement is located". * No longer meets for this level of care |
| C-8 | Benefitting from treatment/reduction of targeted symptoms that led to admission | yes | |
| C-9 | Coordination with primary support system | 11/2 | no collateral |
| C-9 | Coordination with community providers | 11/2 | no |
| C-10 | Discharge planning: Placement, aftercare services, anticipated d/c date | 11/2 | no – no DC planning notes |
| F-3 | Important Message from Medicare signed/dated by pt/guardian within 48 of discharge | | |
| OPTIONAL: SECOND OPINION/RECORD REVIEW OBTAINED FOR CONTINUED STAY 12+ DAYS | | | |
| Corrective actions taken: | | | |
| Outcome: | | | |
| Deficiencies must be verified to be corrected within 1 business day or inform facility CEO and Medical Director. | | | |
| UR Staff Name/Signature | | Date: | |

* No admission criteria and now a placement issue.

177. Patient J.W.'s Progress Note five days later, on November 7, 2016, also lacks any information that would justify a continued stay at PRH. The Progress Note says Patient J.W. "is alert," "oriented x4," "pleasant, cooperative, easily engaged," "denies any suicidal or homicidal ideas, plans, or intents." Instead, the basis for Patient J.W.'s stay appears to be that PRH is "still trying to find . . . safe and adequate placement" at another facility.

PROGRESS NOTE

DATE: 11/07/2016

Patient seen, chart reviewed, staff consulted.

At this time, the patient has no new complaints. She states that she was doing very well during the weekend. We are still trying to find a safe and adequate placement for the patient at this time, and we may have found a place at Next Step for 11/10/2016 with PHP followup.

The patient is alert. She is oriented x4. She is pleasant, cooperative, easily engaged. Her mood is euthymic. Her affect is full range and appropriate to mood. She denies any suicidal or homicidal ideas, plans, or intents. Her speech is clear, coherent, and goal directed. Her insight is good. Her judgment is good. Her impulse control is intact.

**DIAGNOSTIC IMPRESSION:**
1. Schizophrenia chronic paranoid type, F20.0.
2. Cocaine use disorder, severe, F14.20.

**PLAN:** Continue present management.

**TENTATIVE DISCHARGE:** 11/10/2016.

Juan Rodriguez, MD        (Date and Time)    11/8/16  1200

D: 11/07/2016 18:14:32 EST
T: 11/07/2016 18:16:37 EST/MIS1532/11321963
JOB#: 2826557

cc: Juan Rodriguez, MD

178.    PRH paperwork for Patient J.W. shows that Patient J.W. was a Medicare patient.

**PARK ROYAL HOSPITAL**

ADV DIR: U
ADMIT BY: AML

| PATIENT ACCOUNT NUMBER | | | | | | MEDICAL RECORD NUMBER | |
|---|---|---|---|---|---|---|---|
| 0964426 | 9241 Park Royal Drive · Ft. Myers, FL  33908  · (239) 985-2700 | | | | | 000068271 | |

| PATIENT (Full Name, Address, County, Phone) | BIRTH DATE | AGE | SEX | RACE | MAR ST | RELIGION | PATIENT SSN |
|---|---|---|---|---|---|---|---|
| | 08/04/1977 | 39 | F | B | D | U | ***-**-2997 |
| | PATIENT LEGAL STATUS | | FC | ROOM / BED | HSV CODE | | HIPAA NOTICE DATE |
| | V | | M | 2201 /B | AM1 | | 10/25/16 |
| | FATHER NAME | | | | MOTHER NAME | | |
| | | | | | | | |
| | REFERRAL AGENCY | | | | BIRTH PLACE | | |

| GUARANTOR (Name, Address, Phone, SSN, Relationship) | GUARANTOR EMPLOYER (Name, Address, Phone) | ADMISSION DATE & TIME |
|---|---|---|
| | | 10/25/16 14:22 |
| | | ED LEVEL |
| | | U |
| | PHONE #: | ADMITTING PHYSICIAN (Name and Number) |
| | | RODRIGUEZ JUAN |
| | | 9241 PARK ROYAL DRIVE |
| | | FORT MYERS        FL |
| | | 33908 |
| CONTACT 1 (Name, Address, Phone, Relationship) | CONTACT 2 (Name, Address, Phone, Relationship) | PHONE #: |
| | | ATTENDING PHYSICIAN (Name and Number) |
| | PHONE #: | RODRIGUEZ JUAN |
| | | 9241 PARK ROYAL DRIVE |
| | REL: | FORT MYERS        FL |
| | | 33908 |
| | | PHONE #: |

| PRIMARY INSURANCE | | |
|---|---|---|
| Name of Insurance | Address | Telephone Number |
| MEDICARE | PO BOX 2711 | (888) 664 4112 |
| | JACKSONVILLE ,  FL  322310021 | |

## Patient M.K.

179.    PRH involuntarily admitted Patient M.K. for inpatient treatment but kept Patient
M.K. approximately two weeks after Patient M.K. was stable and safe for release before
discharging Patient M.K.

180.    PRH paperwork for Patient M.K. dated February 13, 2017, shows that Patient
M.K. was a Medicare patient, admitted for inpatient treatment on November 27, 2016, and
discharged 23 days later on December 20, 2016.



```
AR0R9A                              PARK ROYAL HOSPITAL                        PAGE    1
2/13/17                      ACCOUNTS RECEIVABLE STATUS REPORT          TIME:  1:02 PM

ACCOUNT NO.--> 0964835           TYPE: I                  GUARANTOR NO.--> 0018381
                                 HOSP SRV CODE: AD2
                                 FINANCIAL CLS: NM M
                                 SSN: 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
                                 ADMITTED----> 11/27/16
                                 DISCHARGED--> 12/20/16


DATE BILLED ------>    12/27/16       NO. OF PAYMENTS ------->           2
TOTAL CHARGED ---->    34,500.00      DATE OF LAST PAYMENT -->     1/18/17
CURRENT DUE ------>    1,288.00       LAST PAYMENT AMOUNT --->   15,233.61
                                      NO. OF STATEMENTS ----->          00
PHYSICIAN: RODRIGUEZ JUAN             DATE LAST STATEMENT --->
                                      LAST STMT. AMOUNT ----->   34,500.00
                                      LAST LETTER NUMBER ---->          00

PAYOR 1 155  PLAN 1 001 MEDICARE                    POLICY# 059807249A
PAYOR 2 455  PLAN 2 001 CENPATICO SUNSHINE          POLICY# 8912752251
PAYOR 3 000  PLAN 3 000                             POLICY#
```

181.   M.K.'s Psychiatric Evaluation dated November 27, 2017, lacks any information
that would justify a continued stay at PRH. The Progress Note says that Patient M.K. "is pleasant
and cooperative," "is alert and oriented x4," "denies suicidal or homicidal thoughts," "denies any
auditory, visual or tactile hallucinations." The Progress Note also says that Patient's M.K.'s
"thoughts appear to be linear, logical, and reality based," and that while Patient M.K. "has some
psychomotor agitation," Patient M.K. has "[n]o tics, tremors or abnormal involuntary
movements." In addition, the Psychiatric Evaluation says that Patient M.K.'s "estimated length
of stay is 3-5 days."

**Physician:** Ivan L. Mazzorana, MD                       **Admission Date:** 11/27/2016

## PSYCHIATRIC EVALUATION

**ALLERGIES:** She has no medication allergies.

**FAMILY HISTORY:** The patient denies any family history of mental illness.

**SOCIAL HISTORY:** As noted, the patient was born and raised in Long Island, New York. Her parents are residing up there and they are divorced. She notes that they are supportive. She has additional family that live in West Palm Beach, Florida who are also supportive and they have been over to this coast to visit her at the New Life Center within last 5 months. She notes that possibly staying with them might to be an additional option going forward for her. She has been staying at New Life Center for the past 5 months. According to the patient, she is welcome to return there if she so chooses. She is a not currently employed. She alludes to a possible history of emotional and physical abuse but does not go into details regarding that. She does have a history of some college attendance in New York state for 3 years in which she was majoring in music. She does have a legal history of 1 prior arrest and 1 overnight stay in jail. No current legal trouble.

**ASSETS AND LIABILITIES:** Assets are supportive family. She is physically well. She is well spoken and motivated for treatment and wellness. Liabilities include limited local support, questionable substance abuse issues, financial and unemployment.

**REVIEW OF SYSTEMS:** Except as noted in HPI is negative for 14 points.

**VITAL SIGNS:** Height 5 feet 6 inches, weight 157 pounds, blood pressure 155/93 upon admission last night. This morning it was retaken and was 107/61. Temperature 97.8 degrees, pulse 89, respirations 18, oxygen is 100%.

**MENTAL STATUS EXAM:** This is a 29-year-old, Caucasian female, who appears stated age. She is pleasant and cooperative. SHe maintains fair eye contact. Her speech is clear and coherent. She has questionable reliability as a historian, however, she is well-spoken. She is alert and oriented x4. Her mood is anxious. Her affect is constricted and suspicious. She denies suicidal or homicidal thoughts. She denies any auditory, visual or tactile hallucinations. Her thoughts appear to be linear, logical, and reality based. She has some psychomotor agitation. No tics, tremors or abnormal involuntary movements. Her impulse control is intact. Her insight and judgment are limited. She is of good cognition. Appears of average intelligence. Her memory is also intact.

**Physician:** Ivan L. Mazzorana, MD                                    **Admission Date:** 11/27/2016

### PSYCHIATRIC EVALUATION

Beach who are also involved and supportive. Her estimated length of stay is 3-5 days. The patient has been explained the current proposed treatment plan. She does agree and understands treatment plan as currently set forth.


_____
Hilary Sojdak, ARNP       (Date and Time)



_____
Ivan L. Mazzorana, MD       (Date and Time)

D: 11/27/2016 12:28:18 EST
T: 11/27/2016 12:30:37 EST/MIS1112/11391595
JOB#: 2854647

CC:   HILARY SOJDAK, ARNP
      IVAN L. MAZZORANA, MD

182.   Patient M.K.'s Progress Note dated December 8, 2016, also lacks any information that would justify a continued stay at PRH. The Progress Note says that Patient M.K. "[d]enies suicidal or homicidal ideation" and "appears stable." The Progress Note also says that Patient M.K.'s discharge "is pending placement" at another facility. Merely looking for placement for an otherwise healthy individual is not an appropriate basis for continuing inpatient therapy services, and, as indicated above, is code for keeping a patient at PRH despite the lack of medical necessity.

183.   Putting the other issues aside, PRH's own paperwork indicates that Patient M.K. should only have stayed at the facility for 3-5 days; yet, PRH kept Patient M.K. for more than three weeks.

PROGRESS NOTE

DATE: 12/08/2016

UNIT: 3 East.

IDENTIFICATION: A 29-year-old female admitted with diagnosis of psychosis, Asperger and anxiety.

SUBJECTIVE: Patient is being seen today. Chart is being reviewed. Patient appears stable and is appropriate to interview today. Patient was talking about her past, how traumatic how her life was. The patient endorsed that for 3 years the mother was not allowing her to be at home during the whole day, and usually had to be in the streets until late hours. The patient also did report that she was sexually abused once in New York when she was 26 years old. Patient did not report PTSD symptoms out of this traumatic event. The patient still endorsing not wanting to going back home and wanting to return to faith-based program that she was in. The patient did report that 1 of her aunts is coming to visit her. Patient has endorsed that she is feeling well, not endorsing suicidal ideation, no intense symptoms of depression or anxiety. Appears euthymic. Affect is restricted. Patient has been compliant with the medication. Denies suicidal or homicidal ideation. No side effects of medication. No ETO in the last 24 hours. No disruptive behavior. Has been participating in groups.

OBJECTIVE: Engaged well in interview. Established good eye contact. No abnormal movements seen. Logical and goal directed. Reality based. Cognitively intact. Not delusional. No suicidal ideation. No visual or auditory or tactile hallucination. No homicidal ideation. Euthymic. Affect is restricted. Insight is limited. Judgment is fair. Impulse is fair.

IMPRESSION:
1. Generalized anxiety disorder.
2. Asperger's syndrome.

PLAN: The patient will continue on same medications. Patient appears stable. The patient is pending

setReasoning

---

PROGRESS NOTE

placement.

**VITAL SIGNS:** Blood pressure is 102/72, temperature 97.0 degrees, pulse is 87, respirations 16, O2 is 98.

_[signature]_  12/8/16  1430

Jorge Diaz, MD          (Date and Time)

D: 12/08/2016 14:30:37 EST
T: 12/08/2016 14:33:14 EST/MIS1590/11436660
JOB#: 2872628

---

Patient M.D.K.

184.    PRH inappropriately and unlawfully admitted Patient M.D.K. for inpatient treatment at PRH even though Patient M.D.K. did not meet the criteria for admission to PRH.

185.    Patient M.D.K. was ordered by court to complete a 28-day substance abuse program.

186.    PRH can only provide substance abuse treatment to individuals requiring emergency medical care for mental illness.

187.    Patient M.D.K. did not require emergency medical care for mental illness. Therefore, PRH was not allowed to admit Patient M.D.K. for substance abuse treatment but did so anyway.  Patient M.D.K. should have been admitted to a facility that is properly credentialed for and eligible to provide stand-alone substance abuse treatment.

188.    Patient M.D.K.'s paperwork shows that Patient M.D.K. was admitted for substance abuse treatment but did not require emergency medical care for mental illness.

| PCN: | MRN: | Facility: Park Royal Hospital - FMA | ROOM#: |
| --- | --- | --- | --- |
| Age: 48 | Gender: Male | DOB: 07/05/1968 | |

**Chief Complaint**
VOLUNTARY STATUS ADMITTED FOR DETOX FROM SUBSTANCE ABUSE.

**HISTORY OF PRESENT ILLNESS**
IS A 48 YEAR OLD MALE ADMITTED VOLUNTARY STATUS FOR OPIOID ADDICTION , HE ADMITS THAT HE IS AN OPOID ADDICT AND WANTS TO DETOX IN ORDER TO BE ACCEPTED INTO A 28 DAY RESIDENTIAL TREATMENT PLAN . PATIENT IS ON PROBATION AND THE PRESIDING JUDGE HAS ORDERED HIM TO ATTEND A 28 DAY PROGRAM , PATIENT HAS BECOME ADDICTED TO OPIATES AFTER HAVING TWO BACK SURGERIES .

189. Patient M.D.K.'s December 6, 2016, Psychiatric Evaluation says that Patient

M.D.K.'s tentative length of stay was for "[s]even to ten days for *detox*." [emphasis added] The

Psychiatric Evaluation also says that Patient M.D.K. "is alert, he is oriented x4. He is pleasant,

cooperative. Easily engaged. His speech is clear, coherent, and goal directed. . . . He denies

suicidal, homicidal ideas, plans or intents. *He is not psychotic at this time.* He is cognitively

intact. His insight is good. His judgment is good." [emphasis added]

## PSYCHIATRIC EVALUATION

EXAMINATION DATE: 12/06/2016

**UNIT:** 2 East.

**HISTORY OF PRESENT ILLNESS:** The patient is a 48-year-old, Caucasian male, who was admitted on a voluntary status with a chief complaint of "I'm opioid addict. I want to detox to get into a 28 day residential treatment." "I'm on probation. The judge said I had to do a 28 day program."

At this time, the patient says that he became addicted to opiates after he had 2 back surgeries. He had been on a fentanyl patch, and also on Roxicodone. Additionally he takes Ambien for sleep. He was taking the medication as prescribed, but at this time he has become dependent on them. The patient was arrested for fraud, and he had an altercation with a cab driver. He was placed on probation and, as part of the probation, the patient is to go to a 28 day program.

The patient denies any present or past history of suicide attempts or ideas. The patient's only complaint at this time is a sleep disturbance with the inability to fall asleep and stay asleep. His major stressor is his legal problems.

**MEDICAL HISTORY:**
1. Chronic back pain.
2. Status post back surgery x2.

**MEDICATIONS:**
1. Fentanyl patch 50 mg every 3 days.
2. Roxicodone 30 mg twice a day.
3. Ambien 10 mg at bedtime.

**ALLERGIES:** No known drug allergies.

**SOCIAL HISTORY:** Patient is on disability after having had 2 back surgeries. He worked in marine construction. He lives with his wife. They have been married for 18 years. Has a 24-year-old son with whom he is in daily contact.

**MENTAL STATUS EXAM:** Patient is alert, he is oriented x4. He is pleasant, cooperative. Easily engaged. His speech is clear, coherent, and goal directed. He at this time is presenting with tremors, restlessness, nausea, but no vomiting. He denies suicidal, homicidal ideas, plans or intents. He is not psychotic at this time. He is cognitively intact. His insight is good. His judgment is good. His impulse

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

*United States and State of Florida ex rel. Franka Tirado, et al. v. Park Royal Hospital, et al.*

50

PSYCHIATRIC EVALUATION

control is intact.

**DIAGNOSTIC IMPRESSION:**
1.   Opiate use disorder, severe, F 11.20.
2.   Adjustment disorder, unspecified, F 43.20.
3.   Chronic back pain.

**PLAN:**
1.   _____ clonidine COWS protocol.
2.   Trazodone 100 mg p.o. at bedtime p.r.n. for sleep.
3.   Vistaril 25 mg p.o. q. 6 hours p.r.n. for anxiety.

**TENTATIVE LENGTH OF STAY:**
1.   Seven to ten days for detox.
2.   We will consider the patient for longer stay if appropriate for rehabilitation.

Patient to be transferred to the dual diagnosis unit in 2 West.

_____
Juan Rodriguez, MD      (Date and Time)

D:  12/06/2016 11:07:34 EST
T:  12/06/2016 11:09:59 EST/MIS1590/11426057
JOB#:  2868163

190.   Because Patient M.D.K. did not require emergency medical care for mental

illness, Patient M.D.K. did not meet the criteria for admission to PRH for inpatient treatment.

191.   Patient M.D.K.'s Progress Note dated December 12, 2016, says that Patient

M.D.K.'s chief complaint was "I am fine" and that he was scheduled for discharge on December

13, 2016.

---

PROGRESS NOTE

DATE: 12/12/2016

**IDENTIFYING DATA:** A 48-year-old Caucasian male.

**CHIEF COMPLAINT:** "I am fine."

**SUBJECTIVE:** Patient reports that his mood is improving. He is sleeping well. He has some cough for which he asked for cough drops but no psychosis. No suicidal or homicidal ideations. Cognitively intact. Oriented x3. Memory, attention, language, fund of knowledge is fair.

**VITALS:** BP 115/84, T 97, P 114, R 16, O2 98.

**REVIEW OF SYSTEMS:** Twelve-point review of systems is negative.

**DIAGNOSIS:** Unchanged.

**PLAN:** Discharge in the morning.

---

Zaheer Aslam, MD          (Date and Time)

D: 12/12/2016 14:06:25 EST
T: 12/12/2016 14:08:41 EST/MIS1112/11448239
JOB#: 2877554

---

192.    Nonetheless, PRH paperwork for Patient M.D.K. shows PRH did not discharge Patient M.D.K. until December 24, 2016, 19 days after Patient M.D.K. was admitted to PRH and 12 days after Patient M.D.K. indicated that he was "fine."

| PATIENT NAME | MRN: | DATE OF ADMISSION | DATE OF DISCHARGE |
|---|---|---|---|
| | 68533 | 12/5/16 | 12/24/16 |
| | RESENT Y OR N | DEFICIENCY | ASSIGNED TO: | DATE COMPLETED |

193.    PRH's Accounts Receivable Status Report for Patient M.D.K. dated February 13, 2017, shows that Patient M.D.K. was a Medicare patient.



```
AR0R9A                           PARK ROYAL HOSPITAL                        PAGE    1
2/13/17                  ACCOUNTS RECEIVABLE STATUS REPORT          TIME:  1:08 PM

ACCOUNT NO.--> 0964965        TYPE: I                 GUARANTOR NO.--> 0018440
                              HOSP SRV CODE: AW1
                              FINANCIAL CLS: F7 SM M
                              SSN: 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
                              ADMITTED----> 12/05/16
                              DISCHARGED--> 12/24/16

DATE BILLED ------>     1/05/17     NO. OF PAYMENTS ------->              2
TOTAL CHARGED ---->    28,500.00    DATE OF LAST PAYMENT -->        1/23/17
CURRENT DUE ------>     1,288.00    LAST PAYMENT AMOUNT --->      11,020.44
                                    NO. OF STATEMENTS ----->             01
PHYSICIAN: RODRIGUEZ JUAN           DATE LAST STATEMENT --->        2/08/17
                                    LAST STMT. AMOUNT ----->       1,288.00
                                    LAST LETTER NUMBER ---->             00

PAYOR 1 155  PLAN 1 001 MEDICARE              POLICY# 273726806A
PAYOR 2 000  PLAN 2 000                       POLICY#
PAYOR 3 000  PLAN 3 000                       POLICY#
```

## Patient M.R.

194.   PRH admitted Patient M.R. for inpatient treatment even though Patient M.R. has autism, Patient M.R. has an intellectual disability, Patient M.R.'s medical condition could not reasonably be expected to improve, and Patient M.R. did not consequently meet the criteria for admission to PRH for inpatient treatment.

195.   PRH paperwork for Patient M.R. shows that Patient M.R. was a Medicare patient, admitted for inpatient treatment on January 24, 2017, and discharged 6 days later on January 30, 2017.



196.    PRH paperwork for Patient M.R. shows that PRH involuntarily admitted Patient

M.R. under Florida's Baker Act for "showing aggressive behavior." The paperwork also notes

that the patient is autistic.

| PCN: | MRN: | Facility: Park Royal Hospital - FMA | ROOM#: |
|------|------|-------------------------------------|--------|
| Age: 22 | Gender: | DOB: 02/14/1994 | |

**Chief Complaint**
AGGRESSIVE BEHAVIOR

**HISTORY OF PRESENT ILLNESS**
22 YEAR OLD MALE BAKER ACTED AFTER SHOWING AGGRESSIVE BEHAVIOR. PATIENT IS AUTISTIC. HE DENIES ANY SOB, CP, OR PALPITATIONS.

197.    Because Patient M.R.'s medical condition could not reasonably be expected to

improve from psychiatric services, Patient M.R. did not meet the criteria for admission to PRH

for inpatient treatment.

<u>Patient P.W.</u>

198.    PRH admitted Patient P.W., a personal friend of Ham and PRH Substance Abuse

Supervisor Frank Mousolini, several times for inpatient treatment even though Patient P.W. did

not have a mental illness requiring inpatient treatment and did not meet the criteria for inpatient treatment during any of his admissions.

199.    Preceding Patient P.W.'s stay at PRH from July 15, 2016, to August 11, 2016, Ham told Snyder that Patient P.W. was on his way down from Georgia and had an alcohol and crack-cocaine problem, or words to that effect.

200.    PRH can only provide substance abuse treatment to individuals requiring emergency medical care for mental illness.

201.    Patient P.W. did not require emergency medical care for mental illness. Therefore, PRH was not allowed to admit Patient P.W. for substance abuse treatment but did anyhow.

202.    Patient P.W. met with Ham in his office almost daily during his stay.

203.    Patient P.W. referred several other individuals to PRH, including Patient J.W.

204.    PRH's Accounts Receivable Status Report for Patient P.W. dated November 9, 2016, shows that Patient P.W. was a Medicare patient, admitted on July 15, 2016, and discharged on August 11, 2016.



205.    Patient P.W.'s psychiatric evaluation dated July 16, 2016, says that Patient P.W.'s

estimated length of stay is "[f]ive to seven days" and describes Patient P.W. as "[c]ooperative."

The evaluation also says that P.W. "seemed depressed" but that he "had good insight," "is alert

and oriented," and "can give consent."

---

PSYCHIATRIC EVALUATION

EXAMINATION DATE: 07/16/2016

**IDENTIFYING DATA:** A 59-year-old, single, white male, voluntarily admitted to 2 West.

**HISTORY OF PRESENT ILLNESS:** The patient was last hospitalized here for rehab in May. Since then, he returned back to work to Bethesda, Georgia, but apparently a month into return to work, he was terminated. This led him to further relapse. However, he was already using 2 weeks after discharge from this facility.

He had been drinking daily, using cocaine and occasionally using Lortab. His drug of choice has always been alcohol. He does not have a complicated withdrawal history, but he does have a comorbidity of HIV and he is on multiple antivirals. The patient states that he is having withdrawals now with headache, nausea, feeling hot and cold, achy and very anxious. He does have a support system, including attending AA and sponsor, but he did not use any of these when he went into relapse. Please refer to the record for extensive history.

**REVIEW OF SYSTEMS:** Besides those stated withdrawals already, the rest is negative.

**MENTAL STATUS EXAM:** Revealed a male who looks stated age. Casually dressed and groomed. Easy to engage. Cooperative. He seemed depressed and a constricted affect. He had good insight and he is alert and oriented and can give consent.

---

PSYCHIATRIC EVALUATION

**AXIS V:** 40.

**PLAN:** Patient will be started on a CIWA protocol with Ativan.

**ESTIMATED LENGTH OF STAY:** Five to seven days.

Omar Rieche, MD     (Date and Time)

D: 07/16/2016 11:51:08 EST
T: 07/16/2016 11:53:23 EST/MIS1388/10895529
JOB#: 2653534

206.    Depression by itself is not a valid reason to keep individuals for inpatient

treatment unless they are a threat to themselves or others.

207.    Patient P.W.'s Progress Note dated July 25, 2016, lacks any information that

would justify a continued stay at PRH. The Progress Note says that Patient P.W.'s chief

complaint was "I'm fine." The Progress Note also says that Patient P.W. "denies suicidal or

homicidal ideation" and has "[n]o psychosis."

---

PROGRESS NOTE

DATE:  07/25/2016

**IDENTIFYING DATA:**  A 59-year-old Caucasian male.

**CHIEF COMPLAINT:**  "I'm fine."

**SUBJECTIVE:**  Patient reports that his mood is improving.  He slept well.  The patient states that he is having terrible headaches 2-3 hours after taking morning medication which is probably a side effect of Wellbutrin.  Will monitor it for couple of more days before making a decision to continue this medication or stop it.  Patient denies suicidal or homicidal ideation.  No psychosis.  He is well groomed. His speech is normal.  The patient is cognitively intact.

**DIAGNOSES:**
1.  Major depressive disorder, recurrent.
2.  Generalized anxiety disorder.
3.  Polysubstance use disorder.

**PLAN:**  Continue current treatment plan.  Reevaluate in the morning for further medicine adjustment.

Zaheer Aslam, MD          (Date and Time)   07/26/16   6:19

D:  07/25/2016 14:03:58 EST
T:  07/25/2016 14:06:10 EST/MIS1262/10926761
JOB#:  2666272

---

208.    Patient P.W.'s Progress Note dated July 31, 2016, also lacks any information that

would justify a continued stay at PRH. The Progress Notes says that Patient P.W. has "[n]o signs

or symptoms at the present time. . . . The patient denies any suicidal or homicidal ideas or plans

at the present time. . . . He is alert and oriented in 3, that is time, person, and place."

---

### PROGRESS NOTE

DATE: 07/31/2016

Patient seen today.  Chart reviewed.  Case discussed with staff.

**SUBJECTIVE:**  The patient is tolerating well the detoxification protocol so far.  No major events.  No side effect to any medication.

**LABORATORY DATA:**  The most recent labs shows white blood cell count 8.2 with hemoglobin of 15.5, hematocrit 48.9.  No growth on the urine culture.  The urinalysis shows negative results.  Sodium 147, potassium 4.5, the glucose is 118, the creatinine 1.05.  The AST 19, ALT 23.  TSH 0.861.  White blood cell count is 5.3 with hemoglobin of 15.7, hematocrit 47.9.  Urine drug screen positive for cocaine, opiates and oxycodone.

**VITAL SIGNS:**  The most recent vital signs shows blood pressure 115/75, heart rate 55 per minute, respiratory rate is 17 per minute.

**REVIEW OF SYSTEMS:**  No signs and symptoms at the present time.

**MENTAL STATUS EXAMINATION:**  The patient is more pleasant, more cooperative.  The eye contact seems to be better.  Speech is more clear, more articulated.  Thought process more linear and more organized.  The patient denies any suicidal or homicidal ideas or plans at the present time.  Denies audio, visual or tactile hallucinations at this moment.  No delusions present or elicited.  He is alert and oriented in 3, that is time, person and place.  Better insight, better judgment and better memory to recent and remote events.

**DIAGNOSES:**
AXIS I:
1.    Alcohol use disorder.
2.    Opiate dependence.
3.    Depressive disorder, not otherwise specified by history.
AXIS II: None.

**PLAN:**  To continue hospitalization.  Case discussed with treatment team.

---

209.    Patient P.W.'s Progress Note dated on August 1, 2016, again lacks any

information that would justify a continued stay at PRH. The Progress Note says that Patient P.W.

"has not demonstrated any signs or symptoms of withdrawal. He is pleasant, cooperative, easily

engaged. His speech is clear, coherent, goal directed. . . . He denies any suicidal or homicidal

ideas, plans or intents. He is not psychotic at this time." In addition, the Progress Note also

shows Patient P.W.'s discharge as "[p]ending at this time."

210.    As provided above, these are false "code words" that indicate PRH is merely

running up the bill to Medicare for a patient that does not need treatment services.

---

<div style="border:1px solid black; padding:10px;">

<center>PROGRESS NOTE</center>

DATE:  08/01/2016

Patient is seen, chart reviewed.  Staff consulted.

The patient was transferred to my service as of this date from Dr. Zaheer Aslam.

At this time, the patient has not demonstrated any signs or symptoms of withdrawal.  He is pleasant, cooperative, easily engaged.  His speech is clear, coherent, goal directed.  His mood is anxious.  His affect is constricted, but appropriate to mood.  He denies any suicidal or homicidal ideas, plans or intents.  He is not psychotic at this time.  He is cognitively intact.  His insight is good.  Judgment is good.  Impulse control is intact.

**DIAGNOSTIC IMPRESSION:**  Unchanged.

**PLAN:**  Continue detoxification/rehabilitation.

**TENTATIVE DISCHARGE:**  Pending at this time.

_Juan Rodriguez, MD_     8/3/16  1130
Juan Rodriguez, MD     (Date and Time)

D:  08/01/2016 16:17:17 EST
T:  08/01/2016 16:19:23 EST/MIS1532/10953702
JOB#:  2677460


cc: Juan Rodriguez, MD

</div>

---

211.    A PRH Accounts Receivable Status Report for Patient P.W. dated November 9,

2016, shows that Patient P.W. was readmitted the same day he was discharged for continued

treatment at PRH from August 11, 2016, to September 8, 2016.



212.  A PRH Demand Bill for Patient P.W. shows that Patient P.W. was also treated at PRH from April 29, 2016, to May 22, 2016.



<center>Patient R.F.</center>

213.  PRH admitted Patient R.F. for inpatient treatment even though Patient R.F. was 80 years old, Patient R.F. had dementia, R.F.'s medical condition could not reasonable be expected to improve, and Patient R.F. did not consequently meet the criteria for admission to PRH for inpatient treatment.

214.  PRH paperwork for Patient R.F. shows that Patient R.F. was a Medicare patient, admitted for inpatient treatment on December 28, 2016, and discharged 29 days later on January 26, 2017.



```
AR0R9A                          PARK ROYAL HOSPITAL                    PAGE   1
2/13/17              ACCOUNTS RECEIVABLE STATUS REPORT          TIME:  2:35 PM

ACCOUNT NO.--> 0965282          TYPE: I                 GUARANTOR NO.--> 0018605
                                HOSP SRV CODE: AO1
                                FINANCIAL CLS: M
                                SSN: 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
                                ADMITTED----> 12/28/16
                                DISCHARGED--> 1/26/17


DATE BILLED ------>     1/29/17      NO. OF PAYMENTS ------->
TOTAL CHARGED ---->   40,500.00      DATE OF LAST PAYMENT -->
CURRENT DUE ------>   25,142.77      LAST PAYMENT AMOUNT --->          .00
                                     NO. OF STATEMENTS ----->           00
PHYSICIAN: MAZZORANA IVAN            DATE LAST STATEMENT --->
                                     LAST STMT. AMOUNT ----->    40,500.00
                                     LAST LETTER NUMBER ---->           00

PAYOR 1 155  PLAN 1 001 MEDICARE                  POLICY# 233560404A
PAYOR 2 300  PLAN 2 001 BCBS FLORIDA              POLICY# XJMH32519539
PAYOR 3 000  PLAN 3 000                           POLICY#
```

215.    PRH's Discharge Summary for Patient R.F. dated January 26, 2017, shows that

Patient R.F. did not meet the criteria for admission to PRH for inpatient treatment. The Discharge

Summary shows that PRH involuntarily admitted Patient R.F. under Florida's Baker Act "due to

physical aggression at the nursing home." The Discharge Summary says that Patient R.F. was

"an 80-year-old gentleman who was admitted with a chief complaint of 'I am at the wall.'" In

addition, the Discharge Summary notes that PRH took Patient R.F. off of "psychotropic drugs"

after Patient R.F.'s admission and that Patient R.F. subsequently "began to display symptoms of

agitation."

**PARK ROYAL HOSPITAL**
9241 Park Royal Drive
Ft. Myers, FL  33908
Phone: (239) 985-2700

---

**Patient Name:** ▓▓▓▓▓▓▓▓▓▓

**Physician:** Ivan L. Mazzorana, MD

**Patient Number:** 68704

**Admission Date:** 12/28/2016

**Discharge Date:** 01/26/2017

### DISCHARGE SUMMARY

**ADMISSION AND DISCHARGE DIAGNOSES:**

1. Neurocognitive disorder with behavioral symptoms.
2. Hypertension.
3. Arthritis.
4. Prostate cancer.
5. Osteoporosis.

**SUMMARY:** The patient is an 80-year-old gentleman who was admitted with a chief complaint of "I am at the wall." He was placed under a Baker Act due to physical aggression at the nursing home. The patient was admitted to Park Royal Hospital and was placed on a drug holiday. Prior to admission the patient had been on Depakote, Namenda, Risperdal and donepezil. The patient, after several days of being off of psychotropic drugs, began to display symptoms of agitation. He was placed on Haldol and

216.   Because Patient S.S.'s medical condition could not reasonably be expected to improve, Patient S.S. did not meet the criteria for admission to PRH for inpatient treatment.

### Patient S.F.

217.   PRH properly admitted Patient S.F. for inpatient treatment at PRH but kept Patient S.F. approximately two weeks after Patient S.F. was stable and safe for release before discharging Patient S.F.

218.   PRH paperwork for Patient S.F. dated November 18, 2016, shows that Patient S.F. was a Medicare patient, admitted for inpatient treatment on December 26, 2016, and discharged 29 days later on January 24, 2017.



```
AR0R9A                         PARK ROYAL HOSPITAL                      PAGE    1
2/13/17               ACCOUNTS RECEIVABLE STATUS REPORT          TIME:  1:05 PM

ACCOUNT NO.--> 0965249        TYPE: I                  GUARANTOR NO.--> 0018378
                              HOSP SRV CODE: AD1
                              FINANCIAL CLS: M
                              SSN: 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
                              ADMITTED----> 12/26/16
                              DISCHARGED-->  1/24/17


DATE BILLED ------>      2/01/17      NO. OF PAYMENTS ------->
TOTAL CHARGED ---->    43,500.00      DATE OF LAST PAYMENT -->
CURRENT DUE ------>    20,863.54      LAST PAYMENT AMOUNT --->            .00
                                      NO. OF STATEMENTS ----->             00
PHYSICIAN: RODRIGUEZ JUAN             DATE LAST STATEMENT --->
                                      LAST STMT. AMOUNT ----->      43,500.00
                                      LAST LETTER NUMBER ---->             00

PAYOR 1 155  PLAN 1 001 MEDICARE                 POLICY# 090327130C1
PAYOR 2 000  PLAN 2 000                          POLICY#
PAYOR 3 000  PLAN 3 000                          POLICY#
```

219.    Patient S.F.'s Progress Note dated January 9, 2017, lacks any information to justify a continued stay at PRH. The Progress Note says that Patient S.F. reported "I am doing good, I feel ready to go." The Progress Note also says that "at this time [the] patient does not present an acute danger to self or others due to psychiatric illness or defect and is ready for discharge. The patient is alert. She is oriented x4. . . . She denies suicidal or homicidal ideas, plans or intents. She is not psychotic at this time." In addition, the Progress Note says Patient S.F. was scheduled for discharge on January 10, 2017.

PROGRESS NOTE

DATE: 01/09/2017

UNIT: 2 East.

Patient seen, chart reviewed.  Staff consulted.

"I am doing good, I feel ready to go."

I reviewed the notes from the weekend.  On 01/08 the patient complained to Zaheer Aslam, MD that she was stiff from Haldol however at this time the patient does not appear to be stiff.  There are no tremors.  There are no abnormal involuntary movements.  No cogwheel rigidity.  The patient appears to have responded well to the treatment regimen.  At this time, it is my clinical opinion that this patient does not present an acute danger to self or others due to psychiatric illness or defect and is ready for discharge.

The patient is alert.  She is oriented x4.  She is groomed at this time.  She denies suicidal or homicidal ideas, plans or intents.  She is not psychotic at this time.  She is pleasant, cooperative, easily engaged.  She is cognitively intact.  Her insight is fair.  Her judgment is good.  Her impulse control is intact.

**DIAGNOSTIC IMPRESSION:**  Schizoaffective disorder, bipolar type, F25.0.

**PLAN:**  Continue present management and discharge patient to home tomorrow in a.m.

_____  01-10-2017  1000
Juan Rodriguez, MD      (Date and Time)

D:  01/09/2017 12:13:50 EST
T:  01/09/2017 12:15:47 EST/MIS1112/11539188
JOB#: 2913927

Patient S.S.

220.    PRH admitted Patient S.S., a 94-year-old with dementia, for one month of

inpatient treatment even though he only needed treatment for several days to implement a new

medication regime.

221.    PRH paperwork for Patient S.S. shows that Patient S.S. was a Medicare patient,

admitted for inpatient treatment on December 21, 2016, and discharged 30 days later on January

20, 2017.

```
                        PARK  ROYAL  HOSPITAL
               DI_ _NOSES / PROCEDURES VALIDA'__ON        PAGE:       1

                                               Date:    1/27/17
                                               Time:  15:20:16

PATIENT NAME:                                  AGE:  94  SEX:   MALE
PATIENT NO:    965194        CHART NO: 000068657   HISTORY NO: 000068657
ADMISSION DATE: 12/21/16     DISCHARGE DATE: 01/20/17
FC: M MEDICARE               SRV:AO1 ACUTE PSYCH GERIATRI
PHYSICIAN: 00001             DISCHARGE STATUS: 03 SKILLED NURSING FACI
```

222.    PRH paperwork for Patient S.S. shows that PRH involuntarily admitted Patient

S.S., a 94-year-old man with dementia, under Florida's Baker Act for "threaten[ing] to kill

someone who allegedly stole his wallet."

### PARK ROYAL HOSPITAL
9241 Park Royal Drive
Ft. Myers, FL  33908
Phone: (239) 985-2700

---

**Patient Name:**                          **Patient Number:** 68657
**Physician:** Ivan L. Mazzorana, MD        **Admission Date:** 12/21/2016
                                            **Discharge Date:** 01/20/2017

### DISCHARGE SUMMARY

**ADMITTING DIAGNOSES:**
1. Dementia with behavioral symptoms.
2. Hypertension.
3. Gout.
4. B12 deficiency.
5. Poor mobility.

**DISCHARGE DIAGNOSES:**
1. Dementia with behavioral symptoms.
2. Hypertension.
3. Gout.
4. B12 deficiency.
5. Poor mobility.

**HISTORY:** The patient is a 94-year-old gentleman admitted to Park Royal Hospital under the Baker Act after he threatened to kill someone who allegedly stole his wallet. This is in the context of significant cognitive impairment.

223.    PRH only needed several days to implement a new medication regime to stabilize

Patient S.S.'s aggression, yet PRH kept Patient S.S. for one month to provide him additional

treatment from which he could not reasonably be expected to benefit as a 94-year-old with dementia.

<div align="center">Patient T.A.</div>

224.   PRH properly admitted Patient T.A. for inpatient treatment at PRH but kept Patient T.A. approximately three weeks after Patient T.A. was stable and safe for release before discharging Patient T.A.

225.   PRH paperwork for Patient T.A. dated November 18, 2016, shows that Patient T.A. was a Medicare patient, admitted for inpatient treatment on October 12, 2016, and discharged 34 days later on November 15, 2016.

```
                          PARK ROYAL HOSPITAL
                   DIAGNOSES / PROCEDURES VALIDA  ON            PAGE:       1

                                                         Date:   11/18/16
                                                         Time:   10:26:29
PATIENT NAME:                                   AGE:  54  SEX:    MALE
PATIENT NO:    964238      CHART NO: 000065572  HISTORY NO: 000065572
ADMISSION DATE: 10/11/16   DISCHARGE DATE: 11/15/16
FC: M MEDICARE             SRV:AW1 ACUTE DUAL DIAG
PHYSICIAN: 00001           DISCHARGE STATUS: 01 DISCHARGED HOME/SELF
```

226.   Patient T.A.'s Progress Note dated October 27, 2016, lacks any information that would justify a continued stay at PRH. The Progress Note says that Patient T.A. "[s]hows no sign and symptoms at the moment, is "pleasant" and "cooperative," "denies anxiety or depression," "denies any suicidal or homicidal plans at present time," "[d]enies audio, visual, tactile, hallucinations at this moment," and "is alert, oriented x3." In addition, the Progress Note says that PRH is "working on discharging the patient soon."

227.   As provided above, these are false "code words" that indicate PRH is merely running up the bill to Medicare for a patient that does not need treatment services.

---

PROGRESS NOTE

DATE: 10/27/2016

**SUBJECTIVE:** ⬛⬛⬛⬛ is seen today.  Chart reviewed.  Case discussed with staff.  The patient looks better, he looks brighter.  No more drowsiness, no more slurred speech.  He tells me that he is sleeping and eating better.

**LABS:** Most recent labs shows no new labs.

**VITAL SIGNS:** Blood pressure 97/60.  Temperature 96.8, the heart rate 53 per minute, respiratory rate 16 per minute.

**REVIEW OF SYSTEMS:** Show no sign and symptoms at the moment.

**MENTAL STATUS EXAM:** The patient is pleasant, he is cooperative.  He shows better eye contact. Speech is more clear, more articulated.  Thought process more linear, more organized.  The patient is telling me "I feel better."  The patient denies anxiety or depression.  At the moment the patient denies any suicidal or homicidal plans at present time.  Denies audio, visual, tactile, hallucinations at this moment. No delusions present or elicited.  The patient is alert, oriented x3.  Better insight, better judgment, and better memory to recent and remote events.

---

PROGRESS NOTE

**AXIS II:** None.

**PLAN:** To continue hospitalization.  My plan is to continue tapering down the Valium.  We are working on discharging the patient soon.

_____
Nelson Hernandez, MD        (Date and Time)

D: 10/27/2016 14:08:33 EST
T: 10/27/2016 14:10:48 EST/MIS1629/11281903
JOB#: 2810209

---

### F.  Online Google Reviews about PRH

228.    Online Google reviews by former PRH patients and their families use descriptions

to describe PRH staff and their experience such as a "joke," "waste of time," "total nightmare,"

"heartless," and "rude."

229.    In describing PRH, a former patient posted, "I wouldn't recommend [PRH] to anyone. I was given incorrect doses of medications & almost another patient[']s medication. The groups were mandatory. They didn't address any of my issues. We played games & music. . . . neither of which helped with my psychiatric issues. I was a voluntary admit & was kept for 9 days. Other patients who were there under [Florida's Baker Act were] discharged earlier. I received more support from other patients who were on my unit. There were rules which applied to some patients & not to others. *Do not send a loved one here. It was a waste of time.*" [emphasis added]

230.    In describing PRH, another former PRH patient posted, "If you or a loved one ever need a mental health facility NEVER go to Park Royal Hospital in Ft. Myers!! It's the worst!!! A total nightmare – no family involvement – no support – only drugs and lock up! – Condescending, patronizing doctor and heartless staff. *This place needs to be shut down!!*" [emphasis added]

231.    In describing PRH, another former PRH patient posted, "The doctors discharge the wrong patients at the wrong time and keep the saner ones longer. They discharged a patient when she was there for 15 days and she said she got no treatment for her depression whatsoever."

232.    Online Google reviews by PRH employees also describe management problems at PRH and use descriptions such as "awful," "corrupt," "nightmarish," and "unethical."

233.    In describing PRH, a former PRH Mental Health Technician posted on January 14, 2014, that "There is so much bull that goes on out there, you will be [in] shock. . . . Most of the time the mental health techs are doing the nurses['] assessments on the patients, the blood draws, [EKGs, etc.] They force medication into patients against their will. . . . They believe in violating patients['] rights across the board."

234.    In describing PRH, another former PRH Mental Health Technician posted on April 20, 2014, that "I worked [the] night shift for three weeks and that was enough. The 'Mental health technician' position is really a [Certified Nursing Assistant]. I had no training and was put into a position of changing diapers, taking vitals while taking orders from people while they either sleep, read books or play on their phones. Do your research before taking a job at this place."

235.    In describing PRH, a PRH employee posted on January 14, 2015, that PRH was a "[v]ery poorly managed facility from its inception. . . . [Acadia] is more focused on acquisitions then employee retention, patient care or improving their facility. . . . *They are only interested in making money by any means possible, and at any cost.* . . . [T]his is the greediest company I have ever worked for. They make Gordon Gekko look like a philanthropist. I am finally leaving this facility. Good riddance!" [emphasis added]

236.    In describing PRH, a PRH Intake Specialist posted on February 6, 2015, that "I have worked here a couple of years now and there still remains a significant disconnect in communication, and leadership with management, and other departments within Park Royal Hospital. There is [a] high turnover rate due to poor moral[e], disorganization, and dysfunctional management."

237.    In describing PRH, a former PRH Utilization Review Specialist posted on July 10, 2015, that "One of [Acadia's] regional CEO's is an ex-felon. *This place is corrupt, and unethical – the regional CEO asked patients to stay longer even though they were ordered by the doctor to be discharged. Nasty, verbally abusive directors. This place needs to be shut down.*" [emphasis added]

238.     In describing PRH, a former PRH Housekeeping Supervisor posted on July 29, 2016, that "I tried to make things better while I was there and make the management aware of the issues but *the management only seemed to care about themselves and the money and bonuses that they were receiving.*" [emphasis added]

239.     In describing PRH, a former PRH Insurance Collection Specialist posted on August 17, 2016, that PRH's Chief Executive Officer "has no clue on the care for patients and it[']s all about making money and not helping the sick people."

## II.     Defendants Are Engaged In An Unlawful Kickback Arrangement

240.     Defendants have a financial quid pro quo that allows them to maximize profits and ignores patients' medical conditions.

241.     PRH sends insured patients to hospitals within the Lee Health system for non-psychiatric medical services that are billed to Medicare and Medicaid – including medically unnecessary services and services never rendered to PRH's patients – and Lee Health compensates PRH for admitting and treating uninsured patients who require emergency medical care.

242.     Lee Health has "medical-surgical" beds for which they can charge insurers $1,400 per day for patient care.

243.     Instead of filling its medical-surgical beds with uninsured individuals who require emergency medical care that could otherwise be filled by insured individuals who require emergency medical care, Lee Health pays PRH $500 per day for five days ($2,500 total) to take in the uninsured individuals who PRH agrees to provide an additional two weeks of complimentary inpatient care.

244.     The arrangement between Lee Health and PRH, which was negotiated when PRH opened, results in a net gain to Lee Health of $900 per patient per day ($1,400 - $500) and a benefit to PRH of $500 per patient per day plus the value of any claims for payment submitted for services rendered to these patients.

245.     Some months PRH has accepted as many as eight uninsured individuals turned away from Lee Health, netting PRH roughly $20,000 per month ($2,500 x 8).

246.     Lee Health also benefits from PRH's Medicare and Medicaid patients who PRH sends to Lee Health for routine medical services the patients do not need and/or which PRH is able to provide according to their license and accreditation but chooses not to. Examples include sending patients out for possible dehydration – PRH only administers IVs when treating patients with ECT – and removal of sutures. Unlike Lee Health which can bill for those services separately, PRH receives a bundled payment from Medicare and cannot bill for those services separately.

247.     IPF patients – who have multiple medical conditions and prescriptions – are a vulnerable patient population. Moving them back and forth between medical facilities is disruptive and stressful for them, and exposes them to increased risk from falls and other injuries.

248.     Lee Health sends PRH patients back to PRH without records about what medical services, if any, Lee Health rendered to them.

249.     Lee Health bills Medicare and Medicaid for the medically unnecessary services and services never provided to PRH's patients, as well as services enumerated above that PRH is able to provide according to their license and accreditation but chooses not to.

### III.   PRH Terminated Snyder's Employment For Disclosing His Concerns About PRH's Unlawful Business Practices

250.    PRH terminated Snyder on February 28, 2017, after Snyder complained on multiple occasions about PRH admitting individuals who did not meet IPF criteria and refusing admission of uninsured individuals who required emergency medical care for mental illness.

251.    On January 30, 2017, one month before his termination, Snyder received a positive 90-day performance review from Ham. Snyder was supposed to receive the 90-day performance review in August 2016 after his promotion to Admissions Director in April 2016.

252.    That same day, PRH admitted two uninsured individuals who required emergency medical care for mental illness and, in accordance with federal law, IPFs must admit for treatment.

253.    Ham subsequently ordered Snyder during a daily staff meeting to instruct his staff to call Ham prior to admitting an uninsured individual to get his permission before admitting uninsured individuals.

254.    In response to Ham's command, Snyder told Ham he could not do that because PRH had to admit uninsured individuals who required emergency medical care for mental illness in accordance with PRH's written policies and the federal Emergency Medical Treatment and Labor Act.

255.    On previous occasions, Ham ordered Snyder's staff to demand payment up front from uninsured individuals or not to admit them. Snyder was uncomfortable with the demand and refused to turn away individuals without insurance if they required emergency medical care for mental illness.

256.    Snyder again complained about PRH's unlawful business practices on the same day he was terminated, February 28, 2017.

257.     On February 28, 2017, Snyder received two missed calls from Hull and two missed call from Paul Rogers, Chief Financial Officer for PRH.

258.     Snyder first returned Rogers call on February 28, 2017.

259.     Rogers told Snyder during their February 28, 2017, phone conversation that a Medicare recipient who was previously denied admission for inpatient treatment at PRH was returning to PRH for a reevaluation, or words to that effect. Rogers also told Snyder that Hull felt it was a mistake to previously deny the individual admission for inpatient treatment and wanted the individual admitted for inpatient treatment, or words to that effect.

260.     Snyder told Rogers something to the effect that he would look at the referral information and keep an eye out for the individual when they got to PRH.

261.     The patient's evaluator recorded on the individual's referral form that the individual had autism, a developmental disability, and bipolar disorder, in that order.

262.     Evaluators generally list the various conditions patients have in order of importance from most important to least important.

263.     Snyder had a conversation with Chris Hansen, Director of Business Development for PRH, after speaking with Rogers by phone on February 28, 2017, during which Snyder stated that the individual did not previously meet IPF criteria for inpatient treatment and that Hull was now pressuring him to admit the individual anyway, or words to that effect.

264.     In response to Snyder, Hansen said, "It doesn't have to be an argument man. Just admit him!" or words to that effect.

265.     In reply, Snyder told Hansen, "It bothers me that our policy is 'we don't do evaluations over the phone, except when John Hull wants us to apparently,'" or words to that effect.

266.    Snyder returned Hull's call after his conversation with Hansen on February 28, 2017, and said that he had already spoken to Rogers and knew the individual was returning for a reevaluation.

267.    In response to Snyder, Hull said that the reevaluation was an opportunity to "correct their mistake," a reference to PRH previously denying the individual admission for inpatient treatment. Hull also asked Snyder to let him know when the individual was admitted.

268.    PRH terminated Snyder's employment after Snyder objected to the patient's admission on February 28, 2017.

269.    After Snyder was terminated and escorted out of PRH on February 28, 2017, the individual was reevaluated and admitted voluntarily

270.    In light of the individual's diagnosis and medical history, Snyder was correct in objecting to the patient's admission.

271.    Generally, individuals with multiple disabilities who are a threat to themselves or others do not have the capacity to sign paperwork for voluntarily admitting themselves, yet PRH allowed the individual – who according to the referral information had autism, a developmental disability, and bi-polar disorder – to voluntarily admit himself for inpatient treatment at PRH.

272.    Generally, individuals with autism or developmental disabilities cannot be admitted involuntarily either; therefore, if the individual could not have been admitted voluntarily, the individual could not have been admitted involuntarily.

273.    The first time the individual was at PRH, the individual was evaluated by Jeff Bush, a licensed clinician, who determined the individual did not meet IPF criteria for inpatient treatment.

274.   The individual had recently been hospitalized at Saluscare and given a prescription for a mood stabilizer and an anxiolytic that the individual's parents had not filled but would have helped relieve the individual's symptoms.

275.   Saluscare is another provider of mental health and substance abuse services in Fort Myers, Florida, that offers a variety of outpatient services but only offers inpatient treatment for substance abuse.

276.   Instead of filling the individual's prescription, the individual's parents took him back to Saluscare and sought to have him admitted.

277.   Saluscare refused to admit the individual, because, as was also determined by PRH clinician Bush, the individual did not meet admission criteria.

278.   While evaluating the individual at PRH, Bush got the impression that the parents wanted a respite from the individual for a while.

279.   Throughout Bush's assessment, the individual was calm and cooperative. The individual showed no signs of psychosis, aggressiveness, or suicidal tendencies. Bush did not believe there was a valid reason at that time to admit the individual and the individual was not admitted for inpatient treatment at PRH.

280.   Kate Weil was the case manager for the individual.

281.   Weil previously worked at PRH when Hull was a Group Chief Executive Officer for Acadia.

282.   Hull and Weil called Snyder to discuss the individual's admission.

283.   During Snyder's conversation with Hull and Weil, Hull said something to the effect of needing PRH to fix the situation for the individual's family so they would be willing to return to PRH.

284.    After Snyder's conversation with Hull and Weil, Hull called Snyder back and censured Snyder for PRH not admitting the individual. Hull said something to the effect of the following: "This is something you have to get… If you're going to be an Admissions Director, you have to understand the business… I am not talking about clinical stuff… You need to understand that if someone has Medicare, and they are looking for help, we are in the business of giving them that help… He's got Medicare! No pre-certs. No review. This is a slam dunk buddy!" or words to that effect.

285.    Before ending the phone conversation, Hull apologized to Snyder for getting so heated and told Snyder something to the effect of the following: (a) that he was anxious about having to go back to Tennessee to explain his division's poor performance; (b) missing individuals like this individual was one of the reasons PRH was not hitting it numbers; and (c) "Now I'm not saying this happens every day, but, you know, I'm there for one day and this is what I see."

286.    Immediately thereafter, PRH terminated Snyder's employment.

### COUNT I:  Federal False Claims Act Violations
### 31 U.S.C. § 3729(a)(1)(A)
### Medical Non-Necessity Claims
### (As to the Individually Named Defendants, PRH, and Acadia)

287.    Relators Tirado and Snyder incorporate all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

288.    In order to properly bill the government for medical services, those services must be medically necessary.

289.    The Individually Named Defendants, PRH, and Acadia admit insured individuals for inpatient treatment at PRH who do not meet IPF criteria for admission, keeps patients longer

than medically necessary, and bills Medicare for medically unnecessary services and services never rendered to them.

290.    Defendants Ham and Hull, both Acadia employees, instruct PRH staff to admit insured individuals for inpatient treatment at PRH and keep them longer than medically necessary.

291.    Defendant PRH administers ECT treatment to involuntarily admitted patients who are legally incompetent to provide express and informed consent to ECT treatment.  PRH changes the admission status of involuntarily admitted patients to voluntary, administers ECT treatment, and changes their admission status back to involuntary.

292.    Set forth more fully above, Relators have identified specific representative patients for which the Individually Named Defendants, PRH, and Acadia provided ineligible or medically unnecessary services but billed the United States for those services anyway.

293.    The false statements and claims for payment were material to the government's decision to pay. When submitting a claim for payment, providers must certify that the treatment provided is medically necessary and in accordance with CMS guidelines.

294.    But-for Defendants' submission of these claims and their false certifications regarding medical necessity, the government would not have reimbursed Defendants for their services.

295.    The Defendants acted with the requisite scienter. Statements from Ham and Hull indicate that they knew and understood admission and eligibility requirements, but disregarded those requirements in order to increase profits at PRH.

296.    The false claims PRH submitted to Medicare are violations of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A), and have cost the United States Government and taxpayers millions of dollars.

### COUNT II:  Federal False Claims Act Violations
### 31 U.S.C. § 3729(a)(1)(B)
### Medical Non-Necessity Claims
### (As to the Individually Named Defendants, PRH, and Acadia)

297.    Relators Tirado and Snyder incorporate all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

298.    Any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim for payment or approval is liable under the False Claims Act.

299.    Defendant PRH falsifies patient records to admit insured individuals for inpatient treatment at PRH who do not meet IPF criteria for admission and keep insured patients for inpatient treatment at PRH longer than medically necessary.

300.    As set forth more fully above, Defendants Ham and Hull, Acadia employees, instruct PRH staff to use code words in patient records to justify keeping patients when not medically necessary while evading detection by Medicare.

301.    The false records PRH created were used to support false claims PRH submitted to Medicare in violation of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)-(B), and have cost the United States Government and taxpayers millions of dollars.

## COUNT III:  Florida False Claims Act Violations
### Fla. Stat. § 68.082(2)(a)
### Medical Non-Necessity Claims
### (As to the Individually Named Defendants, PRH, and Acadia)

302.    Relators Tirado and Snyder incorporate all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

303.    Any person who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval to any State of Florida employee, officer, or agent is liable to the State of Florida.

304.    In order to properly bill the government for medical services, those services must be medically necessary.

305.    The Individually Named Defendants, PRH, and Acadia admit insured individuals for inpatient treatment at PRH who do not meet IPF criteria for admission, keeps patients longer than medically necessary, and bills Medicaid for medically unnecessary services and services never rendered to them.

306.    Defendants Ham and Hull, both Acadia employees, instruct PRH staff to admit insured individuals for inpatient treatment at PRH and keep them longer than medically necessary.

307.    The Individually Named Defendants, PRH, and Acadia provided ineligible or medically unnecessary services but billed the State of Florida for those services anyway.

308.    The false statements and claims for payment were material to the government's decision to pay. When submitting a claim for payment, providers must certify that the treatment provided is medically necessary and in accordance with CMS guidelines.

309.    But-for Defendants' submission of these claims and their false certifications regarding medical necessity, the government would not have reimbursed Defendants for their services.

310.    The Defendants acted with the requisite scienter. Statements from Ham and Hull indicate that they knew and understood admission and eligibility requirements, but disregarded those requirements in order to increase profits at PRH.

311.    The false claims PRH submitted to Medicaid are violations of the Florida False Claims Act, Fla. Stat. § 68.082(2)(a), and have cost the State of Florida and taxpayers millions of dollars.

<div align="center">

**COUNT IV:  Florida False Claims Act Violations**
**Fla. Stat. § 68.082(2)(b)**
**Medical Non-Necessity Claims**
**(As to the Individually Named Defendants, PRH, and Acadia)**

</div>

312.    Relators Tirado and Snyder incorporate all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

313.    Any person who knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim presented to any State of Florida employee, officer, or agent is liable to the State of Florida.

314.    Defendant PRH falsifies patient records to admit insured individuals for inpatient treatment at PRH who do not meet IPF criteria for admission and keep insured patients for inpatient treatment at PRH longer than medically necessary.

315.    Defendants Ham and Hull, Acadia employees instruct PRH staff to use code words in patient records to justify keeping patients when not medically necessary while evading detection by Medicaid.

316.    The false records PRH created were used to support false claims PRH submitted

to Medicaid in violation of the Florida False Claims Act, Fla. Stat. § 68.082(2)(a)-(b), and have

cost the State of Florida and taxpayers millions of dollars.

<div align="center">

**COUNT V:  Federal False Claims Act Violations**
**31 U.S.C. § 3729(a)(1)(A)**
**Violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, et seq.**
**(As to All Defendants)**

</div>

317.    Relators Tirado and Snyder incorporate all of the allegations set forth in the

foregoing paragraphs as though fully alleged herein.

318.    Whoever knowingly and willfully solicits or receives any remuneration (including

any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind in

return for referring an individual to a person for the furnishing or arranging for the furnishing of

any item or service for which payment may be made in whole or in part under a Federal health

care program, or in return for purchasing, leasing, ordering, or arranging for or recommending

purchasing, leasing, or ordering any good, facility, service, or item for which payment may be

made in whole or in part under a Federal health care program, constitutes a false or fraudulent

claim for purposes of subchapter III of chapter 37 of title 31. 42 U.S.C. § 1320a-7b(1), (g) (the

"Anti-Kickback Statute" or "AKS").

319.    Whoever knowingly and willfully offers or pays any remuneration (including any

kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any

person to induce such person to refer an individual to a person for the furnishing or arranging for

the furnishing of any item or service for which payment may be made in whole or in part under a

Federal health care program, or to purchase, lease, order, or arrange for or recommend

purchasing, leasing, or ordering any good, facility, service, or item for which payment may be

made in whole or in part under a Federal health care program, constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of title 31. 42 U.S.C. § 1320a-7b(1), (g).

320.    With respect to violations of 42 U.S.C. § 1320a-7b, a person need not have actual knowledge of 42 U.S.C. § 1320a-7b or specific intent to commit a violation of 42 U.S.C. § 1320a-7b. 42 U.S.C. § 1320a-7b(h).

321.    A violation of the Anti-Kickback Statute is a *per se* violation of the False Claims Act, and any claims submitted pursuant to the unlawful kickback arrangement are false, with or without regard to the medical necessity of the treatment being reimbursed.

322.    Defendants Lee Health and PRH are knowingly and willfully engaged in an unlawful financial kickback arrangement that allows them to maximize profits.

323.    Lee Health and PRH entered into an agreement whereby PRH sends patients to Lee Health for routine medical care and tests that PRH is capable of performing itself.  In exchange, Lee Health agrees to refer its uninsured patients to PRH and pays Lee Health a kickback of $500 per patient per day.

324.    The financial arrangement between Lee Health and PRH is a violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, *et seq.*, and is, therefore, a *per se* violation of the False Claims Act.

## COUNT VI:  Federal False Claims Act Violations
### 31 U.S.C. § 3730(h)
### Retaliation as to Snyder

325.    Relator Snyder incorporates all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

326.    Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged,

demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under 31 U.S.C. § 3730 or other efforts to stop one or more violations of 31 U.S.C. Subtitle III, Chapter 37, Subchapter III. 31 U.S.C. § 3730(h)(1).

327.    Defendant PRH terminated Snyder's employment for disclosing his concerns about PRH's unlawful business practices.

328.    Before PRH terminated his employment, Snyder complained on multiple occasions about PRH admitting individuals who did not meet IPF criteria.

329.    On February 28, 2017, the day of his termination, Defendant Hull censured Snyder for refusing to admit an individual Snyder thought did not meet IPF criteria for inpatient treatment at PRH.

330.    The close temporal proximity between Snyder's protected statements – the last of which occurred on the very day of his termination – is suggestive of causation.

331.    In addition, Snyder's positive performance evaluations prior to his engaging in protected conduct is further suggestive of causation.

332.    But-for Snyder's protected conduct, Defendants would not have terminated his employment.

333.    By terminating Snyder in retaliation for complaining about PRH's unlawful business practices, PRH violated the Federal False Claims Act, 31 U.S.C. § 3730(h).

## COUNT VII:  Florida Whistleblower Protection Statute Violations
### Fla. Stat. §§ 448.101-448.103, *et seq.*
### Retaliation as to Snyder

334.    Relator Snyder incorporates all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

335.    An employer may not take any retaliatory personnel action against an employee because the employee has objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation. Fla. Stat. § 448.102(3).

336.    Snyder was an "employee" and Defendant PRH is an "employer" as the terms are defined by the Florida Whistleblower Protection Statute.

337.    PRH terminated Snyder's employment for disclosing his concerns about PRH's unlawful business practices.

338.    Before PRH terminated his employment, Snyder complained on multiple occasions about PRH admitting individuals who did not meet IPF criteria and refusing admission of uninsured individuals who required emergency medical care for mental illness.

339.    The refusal to admit uninsured individuals who require emergency medical care for mental illness is a violation of state and federal statutes and regulations, including but not limited to Emergency Medical Treatment and Labor Act, 42 U.S.C. § 1395dd, et seq. and Florida Rights of Patients Statute, Fla. Stat. § 394.459, et seq.

340.    The close temporal proximity between Snyder's protected statements – the last of which occurred on the very day of his termination – is suggestive of causation.

341.    In addition, Snyder's positive performance evaluations prior to his engaging in protected conduct is further suggestive of causation.

342.    But-for Snyder's protected conduct, Defendants would not have terminated his employment.

343.    By terminating Snyder in retaliation for complaining about PRH's unlawful business practices, PRH violated the Florida Whistleblower Protection Statute, Fla. Stat. §§ 448.101-448.103, *et seq.*

## PRAYER FOR RELIEF

WHEREFORE, Relators Tirado and Snyder, acting on behalf of and in the name of the United States of America and the State of Florida, and on their own behalf, prays that judgment will be entered against Defendants for violating the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, violating the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*, violating the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, retaliation in violation of the False Claims Act, 31 U.S.C. § 3730(h), and retaliation in violation of the Florida Whistleblower Protection Statute, Fla. Stat. §§ 448.101-448.103, *et seq.* as follows:

a.  That for violations of the False Claims Act, 31 U.S.C. §3729, *et seq.*, this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of the Defendants' unlawful business practices, plus the maximum allowable civil penalty for each act in violation of 31 U.S.C. §3729, *et seq.*;

b.  That for violations of the Florida False Claims Act, Fla. Stat. § 68.081, *et seq.*, this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the State of Florida has sustained because of the Defendants' unlawful business practices, plus the maximum allowable civil penalty each act in violation of Fla. Stat. §

68.081, *et seq.*;

c.  That for retaliation in violation of the False Claims Act, 31 U.S.C. § 3730(h) and the

Florida Whistleblower Protection Statute, Fla. Stat. §§ 448.101-448.103, this Court enter

judgment in favor of Relator Snyder for two times the amount of Relator Snyder's back

pay, interest on the back pay, and compensation for any special damages sustained as a

result of the discrimination, including litigation costs and reasonable attorneys' fees.

d.  That Relators Tirado and Snyder be awarded the maximum amount allowed pursuant to

31 U.S.C. §3730(d),  including the costs and expenses of this action and reasonable

attorneys' fees; and

e.  That the United States Government, the State of Florida, and Relators Tirado and Snyder

receive all other relief, both in law and equity, to which they are reasonably entitled.

<div align="center">

**JURY DEMAND**

</div>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators Tirado and Snyder

hereby demand a jury trial.


April 11, 2017                                    Respectfully Submitted,


                                                  _____/s/_____
                                                  R. Scott Oswald, Esq. (Bar no. 158437)
                                                  David Scher, Esq. (to be admitted *pro hac vice*)
                                                  Andrew Witko, Esq. (to be admitted *pro hac vice*)
                                                  The Employment Law Group, P.C.
                                                  888 17th Street, NW, Suite 900
                                                  Washington, D.C. 20006
                                                  P: (202) 261-2803; F: (202) 261-2835
                                                  dscher@employmentlawgroup.com
                                                  soswald@employmentlawgroup.com
                                                  awitko@employmentlawgroup.com
                                                  Attorneys for *Qui Tam* Plaintiffs

<div align="center">

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States and State of Florida ex rel. Franka Tirado, et al. v. Park Royal Hospital, et al.*

</div>